WILLIAM D. CONNELL (SBN 089124)
bconnell@gcalaw.com
ROBERT W. LUCKINBILL (SBN 131977)
lucky@gcalaw.com
GCA LAW PARTNERS LLP
Attorneys for Plaintiff
2570 W. El Camino Real, Suite 400
Mountain View, CA 94040
650-237-7224 [direct]
650-428-3901 [fax]

Attorneys for Plaintiff,
ADVANCE LIFTS, INC.

## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ADVANCE LIFTS, INC., an Illinois corporation,** | ) No. **3:21-cv-4361** |
| **Plaintiff,** | ) |
| | ) **COMPLAINT FOR BREACH OF** |
| **v.** | ) **CONTRACT, FRAUD IN THE** |
| | ) **INDUCEMENT AND DECLARATORY** |
| | ) **RELIEF** |
| **ORACLE AMERICA, INC., a Delaware corporation, FOLIO3 SOFTWARE, INC. a California corporation, and BANC OF AMERICA LEASING & CAPITAL, LLC, a Delaware limited liability company,** | ) |
| | ) **DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) |

Plaintiff, ADVANCE LIFTS, INC. ("Advance Lifts"), for its claims against Defendants

ORACLE AMERICA, INC. ("Oracle"), FOLIO3 SOFTWARE, INC. ("Folio3") and BANC OF

AMERICA LEASING LLC ("Banc of America"), alleges as follows:

Complaint for Breach of Contract, etc.
Demand for Jury

**JURISDICTION**

1.      Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants, respectively, are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

**VENUE AND INTRADISTRICT ASSIGNMENT**

2.      Advance Lifts is informed and believes, and thereon alleges, that Defendants, Oracle, Folio3, and/or Banc of America reside and/or may be found in this District. Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this District. Further, Advance Lifts and Oracle have agreed venue is proper in this Court pursuant to a written agreement that provides the parties submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties, in California.

**PARTIES**

3.      Plaintiff, Advance Lifts, is a corporation organized under the laws of the State of Illinois, with its principal place of business in Kane County, Illinois..

4.      Defendant, Oracle, is a corporation organized under the laws of the State of Delaware.  Advance Lifts is informed and believes, and thereon alleges, that Oracle's principal place of business is located in San Mateo County, California.

5.      Defendant, Folio3, is a corporation organized under the laws of the State of California. Advance Lifts is informed and believes, and thereon alleges, that Folio3's principal place of business is located in San Mateo County, California.

6.      Defendant, Banc of America, is a limited liability company organized under the laws of the State of Delaware.  Advance Lifts is informed and believes, and thereon alleges, that Banc of America's principal place of business is located in San Francisco County, California, and that none of Banc of America's members and/or managers are citizens of the same state as Advance Lifts.

Complaint for Breach of Contract, etc.
Demand for Jury

- 2 -                                    -- 2 --

## NATURE OF THE ACTION

7.    Advance Lifts manufactures and sells industrial lifts, platforms, turntables, container dumpers, and other related plant equipment. For approximately 20 years, until late 2019, Advance Lifts used a computer software system that integrated sales, manufacturing, and accounting to function as a single system. In or about late October 2019, Advance Lifts purchased software from Oracle to update its computer system and entered into agreements relating thereto with Oracle. On Oracle's recommendation of Folio3 as its preferred implementation consultant for Oracle's NetSuite software, Advance Lifts hired Folio3 to customize the software for Advance Lifts' system. Oracle assigned its right to payment from Advance Lifts to Banc of America. Unbeknownst to Advance Lifts, Oracle's system was missing a key component to fulfill Advance Lifts' requirements. Despite this, Oracle's representative concealed this material fact from Advance Lifts. As set forth herein, Oracle and Folio3 breached their agreements with Advance Lifts due to the wholesale failure of the software and customizations to function.  Accordingly, Advance Lifts terminated the agreement with Oracle. Advance Lifts notified Banc of America that the agreement with Oracle terminated, and thus, no further payments were due from Advance Lifts. Despite the clear breaches of contract, fraud and termination, Oracle and Banc of America have refused to acknowledge the termination of the agreements.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

*Advance Lifts' Business and Software Needs*

8.    Advance Lifts was founded in 1974 and is the leading dock lift manufacturer in the United States.

9.    Advance Lifts manufactures approximately 900 standard product models, including but not limited to dock lifts, mezzanine access lifts, scissors lift tables, industrial turntables, tilters, upenders, container dumpers, work access lifts, and electrical lifts, each of

which can be accessorized in accordance with customer requirements (collectively, the "Products").

10.     Advance Lifts achieved its success through innovative product design, durability, quick deliveries, and superior service for its Products.

11.     In addition to Advance Lifts' standard product models, Advance Lifts also custom designs the Products for its clients.

12.      In order to maintain its competitive advantage, Advance Lifts has used internal manufacturing and business processes and software customized for the purchase, installation, use, and servicing of the Products.

13.     For a period of approximately twenty (20) years prior to 2019, Advance Lifts had utilized a software system which handled three separate functions, including (i) sales, (ii) manufacturing; and (iii) accounting.

14.     The sales component of Advance Lifts' software system was handled through a Customer Relationship Management ("CRM") system, used to track information about Advance Lifts' distributor network and sales performance.

15.     Advance Lifts' CRM was known as the "Access" program, which was custom written to Advance Lifts' specifications, insofar as it configured Advance Lifts' products with its modifications and accessories and produces prices for Advance Lifts' unique product specifications.

16.     The manufacturing and accounting components of Advance Lifts' software system was handled through a Materials Requirement Planning ("MRP") system, used to manage the flow of all manufacturing resources through the production process and tracks all costs to relay to Advance Lifts' accounting system.

17.     The MRP is the heart of a manufacturing company, as it controls the accounting in manufacturing, which is far more complicated than accounting for a service or retail business, and produces all of the financial controls, reports, and statements relating thereto.

18.     Due to fluctuations in the price of raw materials used to manufacture the Products, Advance Lifts needed a MRP system to access current and future raw material pricing to promptly provide quotes to customers for all types of Products.

19.     For approximately 20 years, Advance Lifts used a MRP system called "Fourth Shift."

20.     The Fourth Shift MRP could access market information and use programmed data to generate quotes and efficiently plan and schedule production of the Products.

21.     In 2019, Advance Lifts decided to upgrade its CRM and MRP systems, as it sought to integrate all systems to streamline its quotation, business and manufacturing processes.

**Oracle, Folio3 and Advance Lifts' CRM/MRP Systems**

22.     On October 4, 2019, Advance Lifts' management team, consisting of Henry Renken (President), Ev Latvys (Vice President of Engineering and Chief Operating Officer), Michael Renken (Vice President of Sales), Sean Mays (Vice President of Production), and Al Boris (Controller), met with Kevin Oppe, an Oracle sales representative, and Charles Thevenet, a Folio3 principal who served as a preferred implementation consultant for Oracle's NetSuite (the "October 4 Meeting").

23.     At the October 4 meeting, Advance Lifts' management team presented Oppe and Thevenet an overview of Advance Lifts' business and desire to upgrade its current MRP system to create a combined CRM and MRP quotation system that would work faster and more efficiently than the Fourth Shift MRP.

24.     During the October 4 meeting, Oppe identified Oracle's NetSuite software as a solution to Advance Lifts' needs. NetSuite is a cloud computing software that is used as a platform for business systems. Advance Lifts advised Oracle and Folio3 that NetSuite and the customizations of NetSuite had to contain the following key functions (the "Key Functions"):

> a.     Multiple cost buckets for tracking costs, including a bucket for future costs;

Complaint for Breach of Contract, etc.
Demand for Jury

b. A full array of all commonly available MRP functions, including capacity planning, which Advance Lifts was not using at the time but planned to put into place with the new system;

c. Faster operational speeds than what Advance Lifts' 20 year old system was providing;

d. Full CRM capabilities; and

e. Performance improvements in Advance Lifts' quotation system, with no loss of accuracy.

25. During the October 4 meeting, Oppe assured Advance Lifts that the NetSuite software had modules that could be customized by Folio3 to meet Advance Lifts' needs, including all of the Key Functions.

26. On or about October 28, 2019, Oracle submitted a Subscription Services Agreement ("SSA") for the NetSuite software to Advance Lifts. A true and accurate copy of the SSA is attached hereto as **Exhibit 1.**

27. On or about October 28, 2019, Folio3 submitted a Statement of Work ("SOW") to Advance Lifts for the customization and implementation of the NetSuite software. A true and accurate copy of the SOW is attached hereto as **Exhibit 2.**

28. On or about October 28, 2019, Oppe, Thevenet and Henry Renken met to sign the SOW and SSA. At that meeting, Henry Renken inquired of Oppe: "This NetSuite will be an upgrade from my current MRP system, faster and better and more complete?" and Oppe replied, "Yes."

29. At the time Oppe answered Henry Renken's inquiry, Oppe knew or should have known Advance Lifts was relying on this assurance that the NetSuite software would perform the Key Functions as a condition for Advance Lifts to agree to enter into the SSA and the SOW.

30. Unbeknownst to Advance Lifts, in October 2019, Oracle did not offer an MRP component to the NetSuite software. In fact, Oracle would not include an MRP component in the NetSuite software until approximately one year thereafter.

Complaint for Breach of Contract, etc.
Demand for Jury

31.     Oppe knew or should have known that the NetSuite software did not contain an MRP component in October 2019 when he met with Advance Lifts' management team.

32.     Oppe knew or should have known that without the MRP component, the NetSuite software could not be customized to perform the Key Functions as represented to Advance Lifts.

33.     Oppe concealed his knowledge of the fact that NetSuite did not have an MRP component.

34.     Based upon assurances from Oppe that the NetSuite software could integrate MRP to operate faster and better than the Fourth Shift MRP to perform the Key Functions, Advance Lifts signed the SSA and the SOW.

35.     On or about October 28, 2019, Oracle assigned its right to payment from Advance Lifts to Banc of America (the "Assignment"). A true and accurate copy of the Assignment is attached hereto as **Exhibit 3.**

***Customization and Implementation of NetSuite***

36.     Beginning in December 2019, Folio3 attempted to customize NetSuite pursuant to the SOW.

37.      Folio3 worked on the customization even though the NetSuite system did not have the necessary MRP component for the Key Functions.

38.     From December 2019 through November 2020, Folio3 continued to work on the customization of the NetSuite system for Advance Lifts.

39.     Folio3 was never able to customize the NetSuite software to fully perform the Key Functions.

40.     The NetSuite customizations took longer than anticipated because as problems with the software would arise, Folio3 would attempt to fix the problems only to have the problems reappear.

41.     The software problems included but were not limited to:
       a.     MRP response times were extremely slow, and they grew even slower as more data was entered;

Complaint for Breach of Contract, etc.
Demand for Jury

b.      Cost updates took two (2) days instead of one (1) hour, and there was a lack of multiple cost buckets; and

c.      The quotation system was unstable and generated numerous, random errors.

42.     Advance Lifts personnel were called upon to oversee and devote extensive amounts of time with Folio3 to correct programming errors and correct NetSuite's functionality problems. This extensive and costly diversion of the Advance Lift's personnel was not originally contemplated at the execution of the SSA and SOW.

***NetSuite's Failure to Perform Functions as Represented***

43.     By December 2020, it became clear to Advance Lifts that NetSuite would never be able to perform the Key Functions.

44.     Specifically, as customized by Folio3, NetSuite failed to perform as promised in that it:

a.      Did not have multiple cost bucket capabilities, including but not limited to a cost bucket for future costs;

b.      Took two (2) days to update cost rolls and revaluations, instead of one (1) hour with Advance Lifts' prior system;

c.      Did not expeditiously perform item replacement in bills of material;

d.      Did not automatically identify operators that modified bills of material;

e.      Took substantially longer to perform all common MRP tasks than Advance Lifts' 20-year-old software; and,

f.      Could not perform MRP tasks common within the industry.

45.     The failure of NetSuite to perform the Key Functions was substantially related to the fact that NetSuite did not have an MRP component that could be integrated into the customizations performed by Folio3.

46.     Folio3's attempts to patch, repair, and/or fix the failed Key Functions were inadequate and the NetSuite software continued to fail to perform the Key Functions.

Complaint for Breach of Contract, etc.
Demand for Jury

***Notice of Breach to Oracle, Failure to Cure and Termination***

47.     On January 25, 2021, Henry Renken served a Notice of Breach of Contract and Notice of Deficiencies upon Roman Bukary, Oracle's Vice President of NetSuite sales (the "First Notice of Breach"). A true and accurate copy of the First Notice of Breach is attached hereto as **Exhibit 4**. The First Notice of Breach outlined the deficiencies in NetSuite's performance and gave Oracle 30 days to cure the deficiencies.

48.     Oracle rejected the First Notice of Breach demanding that Advance Lifts issue a Notice of Breach to its General Counsel as set forth in 6.2 of the SSA.

49.     Despite the rejection of the First Notice of Breach, Oracle communicated electronically and telephonically with Advance Lifts' personnel to attempt to patch, repair, and/or fix the failed Key Functions.

50.     Oracle's personnel were unable to patch, repair, and/or fix the failed Key Functions.

51.     On March 1, 2021, Advance Lifts served a second notice of breach upon Oracle which gave Oracle an additional 30 days to cure the deficiencies by patching, repairing, and/or fixing the failed Key Functions (the "Second Notice of Breach").  A true and accurate copy of the Second Notice of Breach is attached hereto as **Exhibit 5**.

52.     During the cure periods triggered by the First Notice of Breach and the Second Notice of Breach, Oracle attempted to perform "fixes" for the deficiencies in the NetSuite software, but Oracle did not fix the failed Key Functions.

53.     Therefore, on April 8, 2021, counsel for Advance Lifts served counsel for Oracle with a Notice of Termination due to Oracle's breach of the SSA. A true and accurate copy of the Notice of Termination is attached hereto as **Exhibit 6**.

54.     Although Oracle has breached the SSA and failed to cure the breaches:
a.      Oracle refuses to acknowledge the termination of the SSA; and

b.      Banc of America refuses to acknowledge that, as a result of the termination, it is no longer entitled to payment from Advance Lifts.

Complaint for Breach of Contract, etc.
Demand for Jury

*Notice of Termination to Banc of America*

55.     On April 8, 2021, counsel for Advance Lifts served Banc of America with a copy of the Notice of Termination to Oracle. A true and accurate copy of the correspondence to Banc of America is attached hereto as **Exhibit 7.**

56.     Banc of America has refused to acknowledge the termination of the SSA.

57.     Banc of America continues to demand payment from Advance Lifts pursuant to the assignment from Oracle, despite having been notified that Oracle is no longer entitled to payment pursuant to the SSA.

58.     On May 19, 2021, Banc of America issued a written notice to Advance Lifts asserting Advance Lifts was in default under the Assignment.

59.     Banc of America, as Oracle's assignee, notified Advance Lifts it was exercising its option to accelerate the entire balance due, pursuant to the Assignment between Oracle and Banc of America, and has demanded payment of $351,816.15.

## CAUSES OF ACTION

### *First Claim for Relief*

### *Breach of Contract Against Oracle*

60.     Advance Lifts realleges and incorporates by reference the allegations of paragraphs 1 through 59, inclusive, above, as this paragraph 60 of this Claim for Relief, as completely as if set forth in full herein.

61.     Advance Lifts performed each of its obligations under the SSA.

62.     Pursuant to the SSA, Oracle was to provide Advance Lifts with software that would perform certain services with respect to the operations of Advance Lifts' business.

63.     Oracle identified NetSuite as the software that would provide those services.

64.     The NetSuite software failed to perform those services, including the Key Functions described in paragraph 24 above.

65.     Pursuant to the SSA, Advance Lifts provided Oracle with more than 60 days to cure the NetSuite software's failure to perform the Key Functions.

66.      Oracle did not cure NetSuite software's failure to perform Key Functions within the cure period and, as a result thereof, Oracle is in breach of the SSA.

67.     As a result of Oracle's breach of the SSA, Advance Lifts terminated the SSA effective January 1, 2021.

68.     As a direct and proximate result of Oracle's breach of the SSA, Advance Lifts incurred damages in the sum of $278,000, including but not limited to the following:

    a.     $87,000 in fees paid to Oracle;

    b.     $74,000 in fees paid to Folio3; and

    c.     $117,000 in compensation paid to Advance Lifts personnel (Vice President of Manufacturing, and Vice President of Sales), who each spent in excess of 50% of their time addressing the deficiencies in NetSuite's software.

**WHEREFORE**, Plaintiff, Advance Lifts Inc., respectfully requests that this Court enter a Judgment in its favor and against Defendant, Oracle America, Inc., as to the First Claim for Relief of its Complaint, in an amount not less than $278,000, and for all other relief this Court deems just and appropriate.

### *Second Claim for Relief*

### *Fraud in the Inducement Against Oracle*

69.     Advance Lifts realleges and incorporates by reference the allegations of paragraphs 1 through 59 inclusive, above, as this paragraph 69 of this Claim for Relief, as completely as if set forth in full herein.

70.     In September 2019, prior to the execution of the SSA, Oracle's representative, Oppe, and Folio3's representative, Thevenet, represented to Advance Lift's management team that the NetSuite software would perform CRM and MRP faster than Advance Lifts' existing system.

71.     Advance Lifts relied on these assurances in deciding to proceed with NetSuite and signing the SSA.

72.     Oracle knew or should have known that Advance Lifts was relying on the assurances that NetSuite would perform CRM and MRP faster than Advance Lifts' existing system.

73.     At the time that the representations were made, Oracle's representative knew or should have known that Oracle did not have an MRP system and so it would not be included in NetSuite.

74.     On information and belief, Oracle's representative deliberately concealed the fact that NetSuite did not included a MRP system in order to induce Advance Lifts to enter into the SSA.

75.     Advance Lifts relied to its detriment on Oracle's representative's false statement of fact by entering into the SSA.

76.     Advance Lifts would not have entered into the SSA if it had known that NetSuite did not include MRP software; specifically, Advance Lifts would have ended its negotiations with Oracle and would have looked elsewhere for software that could perform MRP.

77.     Advance Lifts' reliance on Oracle's false statements was justified in that Advance Lifts had no reason to doubt the truthfulness of the statements of Oracle's representatives.

78.     Oracle's inducing Advance Lift's reliance on its concealment of a material fact was the direct and proximate cause of Plaintiff's loss, which Plaintiff would not have sustained but for Defendant's fraud.

79.     As a result of Oracle's concealment of a material fact, Advance Lifts is entitled to an award of damages in the sum of $278,000, including but not limited to the following:

a.      $87,000 in fees paid to Oracle;

b.      $74,000 in fees paid to Folio3; and

c.      $117,000 in compensation paid to Advance Lifts personnel (Vice President of Manufacturing, and Vice President of Sales), who each spent

in excess of 50% of their time addressing the deficiencies in NetSuite's software.

80.     Additionally, Plaintiff is entitled to punitive damages as a result of Oracle's fraudulent conduct in an amount to be determined by a trier of fact.

**WHEREFORE**, Plaintiff, Advance Lifts Inc., respectfully requests that this Court enter a Judgment in its favor and against Defendant, Oracle America, Inc., as to the Second Claim for Relief of its Complaint, in an amount not less than $278,000, and for all other relief this Court deems just and appropriate.

### *Third Claim for Relief*

### *Breach of Contract Against Folio3*

81.     Advance Lifts realleges and incorporates by reference the allegations of paragraphs 1 through 59, inclusive, above, as this paragraph 81 of this Claim for Relief, as completely as if set forth in full herein.

82.     Pursuant to the SOW, Folio3 was to provide Advance Lifts with customization of the NetSuite software that conformed to the specifications of Advance Lifts.

83.     Between December 2019 and November 2020, Folio3 worked on the customization of the NetSuite system, even though it did not have the necessary MRP component for the Key Functions.

84.     As such, the purportedly customized NetSuite software failed to perform the Key Functions described in paragraph 24 above.

85.     As a result thereof, Folio3 breached the SOW.

86.     As a direct and proximate result of Folio's breach of the SOW, Advance Lifts incurred damages in the sum of $278,000, including but not limited to the following:

      a.     $87,000 in fees paid to Oracle;

      b.     $74,000 in fees paid to Folio3; and

      c.     $117,000 in compensation paid to Advance Lifts personnel (Vice President of Manufacturing, and Vice President of Sales), who each spent

Complaint for Breach of Contract, etc.
Demand for Jury

- 13 -

-- 13 --

in excess of 50% of their time addressing the deficiencies in NetSuite's software.

**WHEREFORE**, Plaintiff, Advance Lifts Inc., respectfully requests that this Court enter a Judgment in its favor and against Defendant, Folio3 Software, Inc., as to the Third Claim for Relief of its Complaint, in an amount not less than $278,000, and for all other relief this Court deems just and appropriate.

### *Fourth Claim for Relief*

### *Declaratory Judgment as to the Termination of the SSA,  the Payment Assignment*
### *to Banc of America, and the Payment Obligations of Advance Lifts*

87.    Advance Lifts realleges and incorporates by reference the allegations of paragraphs 1 through 59, inclusive, above, as this paragraph 87 of this Claim for Relief, as completely as if set forth in full herein.

88.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that:

    a.    The SSA was terminated by Advance Lifts; and

    b.    As a result of the termination of the SSA, Banc of America is no longer entitled to payment from Advance Lifts.

89.    A judicial declaration is necessary and appropriate regarding the following:

    a.    The termination of the SSA effective January 1, 2021;

    b.    Advance Lifts is not obligated to pay service fees as of January 1, 2021 due to the termination of the SSA; and

    c.    Banc of America's right to payment from Advance Lifts terminated concurrently with the termination of the SSA.

///

///

///

Complaint for Breach of Contract, etc.
Demand for Jury

**WHEREFORE**, Plaintiff, Advance Lifts Inc., respectfully requests that this Court enter a Judgment in its favor and against Defendant, Banc of America Leasing & Capital, LLC, as to the Fourth Claim for Relief of its Complaint, for a judicial declaration that (a) the termination of the SSA was effective January 1, 2021; (b) Advance Lifts is not obligated to pay service fees as of January 1, 2021 due to termination of the SSA; and (c) Banc of America's right to payment from Advance Lifts terminated concurrently with the termination of the SSA, and for all other relief this Court deems just and appropriate.

### RELIEF REQUESTED

Plaintiff Advance Lifts prays that this Court enter judgment in its favor on each and every one of its claims for relief set forth above and award it relief as against Defendants, and each of them, including, but not limited to, the following:

A.      On the First Claim for Relief as against Oracle, a Judgment in Plaintiff's favor and against Defendant, Oracle America, Inc., in an amount not less than $278,000;

B.      On the Second Claim for Relief as against Oracle, a Judgment in Plaintiff's favor and against Defendant, Oracle America, Inc., in an amount not less than $278,000, as well as punitive damages in an appropriate amount to be determined according to proof;

C.      On the Third Claim for Relief as against Folio3, a Judgment in Plaintiff's favor and against Defendant, Folio3 Software, Inc., in an amount not less than $278,000;

D.      On the Fourth Claim for Relief as against Banc of America, a Judgment in Plaintiff's favor and against Defendant, Banc of America Leasing & Capital, LLC, for a judicial declaration that (a) the termination of the SSA was effective January 1, 2021; (b) Advance Lifts is not obligated to pay service fees as of January 1, 2021 due to termination of the SSA; and (c) Banc of America's right to payment from Advance Lifts terminated concurrently with the termination of the SSA;

1    E.      For costs of suit herein; and

2    F.      For such other and further relief as the Court deems just and proper.

3

4    DATED: June 8, 2021

5

6                                    **WILLIAM D. CONNELL**
                                     **ROBERT W. LUCKINBILL**
7                                    **GCA LAW PARTNERS LLP**

8                                    By: /s/*William D. Connell*_____
                                           William D. Connell
9

10                                   Attorneys for Plaintiff
                                     ADVANCE LIFTS, INC.

11

12   William D. Connell, Calif. SBN 089124
     *bconnell@gcalaw.com*
13   Robert W. Luckinbill, Calif. SBN 131977
     *lucky@gcalaw.com*
14   GCA LAW PARTNERS LLP
     2570 W. El Camino Real, Suite 400
15   Mountain View, CA 94040
16   650-237-7224 [direct]
     650-428-3901 [fax]
17

18   Beverly A. Berneman [*pro hac vice* admission pending]
     *baberneman@gct.law*
19   David J. Ben-Dov [*pro hac vice* admission pending]
     *djbendov@gct.law*
20   GOLAN CHRISTIE TAGLIA LLP
     70 W. Madison, Suite 1500
21   Chicago, Illinois 60602
     (312) 263-2300 [tel.]
22   (312) 263-0639 [fax]

23

24   Attorneys for Plaintiff,
     ADVANCE LIFS, INC.

25

26

Complaint for Breach of Contract, etc.
Demand for Jury

## DEMAND FOR TRIAL BY JURY

Plaintiff Advance Lifts, Inc., hereby demands a trial by jury of all issues so triable.


DATED: June 8, 2021

**WILLIAM D. CONNELL**
**ROBERT W. LUCKINBILL**
**GCA LAW PARTNERS LLP**

By: /s/ *William D. Connell*
        William D. Connell

Attorneys for Plaintiff
ADVANCE LIFTS, INC.

Complaint for Breach of Contract, etc.
Demand for Jury

- 17 -

-- 17 --

# EXHIBIT 1

**Subscription Services Agreement**

This Subscription Services Agreement ("Agreement") is entered into as of the date of the last party to sign below ("Effective Date") between Oracle America, Inc. ("Oracle"), and the entity which has executed this Agreement as identified in the signature block hereto ("Customer"). Capitalized terms not defined elsewhere in this Agreement shall have the meaning given to them in the Definitions section below. Oracle and Customer hereby agree as follows:

**Definitions.**

**"Cloud Service"** means, collectively, the NetSuite online business application suite (and any optionally procured modules) (the "NetSuite Service") and/or the OpenAir online Professional Services Automation application suite (and any optionally procured modules) (the "OpenAir Service") as described in the applicable User Guides that is procured by Customer from Oracle in the Estimate/Order Form and any subsequent Estimate/Order Form from time to time, including associated offline components, but excluding Third Party Applications, Support Services and Professional Services.

**"Customer Data"** means all electronic data or information submitted to and stored in the Cloud Service by Users.

**"Electronic Communications"** means any transfer of signs, signals, text, images, sounds, data or intelligence of any nature transmitted in whole or part electronically received and/or transmitted through the Cloud Service.

**"Estimate/Order Form"** means an Oracle estimate, renewal notification or order form in the name of and executed by Customer and accepted by Oracle which specifies the Cloud Service, and any Support Services and/or Professional Services to be provided by Oracle subject to the terms of this Agreement.

**"Help Documentation"** means the online English language help center documentation describing the Cloud Service features, including User Guides which may be updated from time to time.

**"Professional Services"** means the general consulting, implementation and/or training services to be provided to Customer pursuant to the terms hereof, the additional terms of the Professional Services Addendum available at www.netsuite.com/tos or such other URL as specified by Oracle (the "Professional Services Addendum"), and a Statement of Work.

**"Statement of Work"** or "**SOW**" means a separate document or Estimate/Order Form between Oracle and Customer that details the Professional Services to be delivered by Oracle.

**"SuiteApp.com"** means the Oracle online directory of applications that interoperate with the Cloud Service, located at http://www.netsuite.com/suiteapp or at any successor websites.

**"Support Services"** means the supplemental, fee-based technical support services to be provided to Customer for the Cloud Service pursuant to the terms hereof and the additional terms for Support Services available at www.netsuite.com/supportterms or such other URL as specified by Oracle.

**"Third Party Applications"** means applications, integrations, services, or implementation, customization and other consulting services related thereto, provided by a party other than Oracle, as further described in the section below entitled "Third Party Applications" that interoperate with the Cloud Service, including but not limited to those listed on SuiteApp.com.

**"Users"** means individuals who are authorized by Customer to use the Cloud Service pursuant to this Agreement or as otherwise defined, restricted or limited in an Estimate/Order Form or amendment to this Agreement, for whom subscriptions to a Cloud Service have been procured. Users may include but are not limited to Customer's and Customer's affiliates' employees, consultants, contractors and agents.

**"User Guides"** mean the online English language user guides for the Cloud Service, accessible via login at http://www.netsuite.com (under "Help") or included in the Program Documentation on www.oracle.com, as updated from time to time.

**"URL Terms"** means the terms with which Customer must comply, which are located at a URL, referenced in this Agreement and are hereby incorporated by reference.

**1.    Services.** Subject to the terms and conditions of this Agreement, Customer shall have the non-exclusive, worldwide, limited right to use the Cloud Service, Support Services and Professional Services ordered by Customer (collectively, the "Services") during the applicable period set forth in Customer's applicable Estimate/Order Form or SOW solely for the internal business operations of Customer. Customer may allow its Users to use the Services for this purpose, and Customer is responsible for their compliance with this Agreement and Customer's applicable Estimate/Order Form or SOW. The terms of this Agreement shall also apply to updates and upgrades subsequently provided by Oracle to Customer for the Cloud Service. Oracle shall host the Cloud Service and may update the functionality, user interface, usability and other user documentation,

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG                                                                                    Page **1** of 9
«Subsidiary_Name_Signature_Block» – Confidential Information

-- 19 --

**Subscription Services Agreement**

training and educational information of, and relating to the Services from time to time in its sole discretion and in accordance with this Agreement as part of its ongoing mission to improve the Services and customers' use of the Services.

**2. Estimates/Order Forms.** The Services shall be ordered by Customer pursuant to Estimates/Order Forms. Each Estimate/Order Form shall include at a minimum a listing of the Cloud Service and any Support Services and/or Professional Services being ordered and the associated fees. Except as otherwise provided on the Estimate/Order Form, Statement of Work or this Agreement, once placed, each Estimate/Order Form and Statement of Work is non-cancellable and all sums paid are non-refundable.

Any one of Customer's majority owned subsidiaries may also order Services under this Agreement by entering into an Estimate/Order Form or SOW, signed by such subsidiary and Oracle, and agreeing to be bound by the terms of this Agreement and such Estimate/Order Form or SOW. For the purposes of such Estimate/Order Form or SOW, "Customer" as used in such Estimate/Order Form or SOW and this Agreement, shall be deemed to refer to the majority owned subsidiary executing such Estimate/Order Form or SOW.

**3. Restrictions.**

**3.1. General Restrictions.**

**3.1.1.** Customer may not, and may not cause or permit others to: (a) use the Cloud Service to harass any person; cause damage or injury to any person or property; publish any material that is false, defamatory, harassing or obscene; violate privacy rights; promote bigotry, racism, hatred or harm; send unsolicited bulk e-mail, junk mail, spam or chain letters; infringe property rights; or otherwise violate applicable laws, ordinances or regulations; (b) perform or disclose any benchmarking, availability or performance testing of the Cloud Service; or (c) perform or disclose any performance or vulnerability testing of the Services without Oracle's prior written approval, perform or disclose network discovery, port and service identification, vulnerability scanning, password cracking, remote access or penetration testing of the Cloud Service (the "Acceptable Use Policy"). In addition to other rights that Oracle has in this Agreement and Customer Estimate/Order Form, Oracle has the right to take remedial action if the Acceptable Use Policy is violated, and such remedial action may include removing or disabling access to material that violates the policy.

**3.1.2.** Customer may not, and may not cause or permit others to: (a) modify, make derivative works of, disassemble, decompile, reverse engineer, reproduce, republish, download, or copy any part of the Services (including data structures or similar materials produced by programs); (b) access or use the Services to build or support, directly or indirectly, products or services competitive to Oracle; or (c) license, sell, transfer, assign, distribute, outsource, permit timesharing or service bureau use of, commercially exploit, or make available the Services to any third party except as permitted by this Agreement or Customer Estimate/Order Form.

**3.1.3.** Customer is responsible for ensuring that its use of the Cloud Service to store or process credit card data complies with applicable Payment Card Industry Data Security Standards ("PCI DSS") requirements and shall not store credit card and social security data in the Cloud Service except in the designated encrypted fields for such data.

**3.2. HIPAA.** Customer agrees that: (i) Oracle is not acting on Customer's behalf as a Business Associate or subcontractor; (ii) the Cloud Service may not be used to store, maintain, process or transmit protected health information ("PHI") and (iii) the Cloud Service will not be used in any manner that would require Oracle or the Cloud Service to be compliant with the Health Insurance Portability and Accountability Act of 1996, as amended and supplemented ("HIPAA"). In the preceding sentence, the terms "Business Associate," "subcontractor," "protected health information" or "PHI" shall have the meanings described in HIPAA.

**4. Term, Fee, Payment & Taxes.**

**4.1. Term.** The term of this Agreement shall commence on the Effective Date and shall continue for the length of time referenced in all Estimate/Order Forms and SOWs for the Services (the "Term"). The initial subscription term of the Cloud Service and/or Support Services procured by Customer shall continue for the term applicable to such Services specified in the applicable Estimate/Order Form. If Customer has not entered into an Estimate/Order Form with Oracle regarding renewal of Customer's Cloud Service and/or Support Services prior to the expiration of the initial term or then-current renewal term of such Services, then the subscription term for such Services shall be automatically renewed for a term of one (1) year unless either party provides written notice of non-renewal to the other at least thirty (30) days before expiration of the applicable initial term or then-current renewal term.

**4.2. Fees and Payment.** All fees payable are due within 30 days from the invoice date unless otherwise specified in the applicable Estimate/Order Form. All fees are non-refundable, except as otherwise explicitly stated in the applicable Estimate/Order Form or this Agreement.

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG
«Subsidiary_Name_Signature_Block» – Confidential Information

Page **2** of **9**

-- 20 --

**4.3.** The fees and the term of use for additional Users and other items procured during an existing subscription term will co-terminate with and be prorated through the end date of the subscription term for the applicable Cloud Service. Pricing for subsequent renewal Estimate/Order Forms shall be set at then current Cloud Service pricing, unless otherwise agreed to by the parties. If the fees for a feature or functionality of the Cloud Service are based on usage of the Cloud Service, then Oracle may access and use Customer Data as reasonably necessary to determine the fees for the applicable feature or functionality.

**4.4.**    **Taxes.** Oracle fees do not include any local, state, federal or foreign taxes, levies or duties of any nature, including value-added, sales use or withholding taxes ("Taxes"). Customer is responsible for paying all Taxes, excluding only taxes based on Oracle's net income. If Oracle has the legal obligation to pay or collect Taxes for which Customer is responsible under this Section, the appropriate amount shall be invoiced to and paid by Customer unless Customer provides Oracle with a valid tax exemption certificate authorized by the appropriate taxing authority.

## 5. Proprietary Rights.

**5.1.**    **Ownership of Customer Data.** As between Oracle and Customer, all title and intellectual property rights in and to the Customer Data is owned exclusively by Customer. Customer acknowledges and agrees that in connection with the provision of the Services, Oracle may store and maintain Customer Data for a period of time consistent with Oracle's standard business processes for the Services. Following expiration or termination of the Agreement or a Customer account, if applicable, Oracle may deactivate the applicable Customer account(s) and delete any data therein. Customer grants Oracle the right to host, use, process, display and transmit Customer Data to provide the Services pursuant to and in accordance with this Agreement and the applicable Estimate/Order Form or SOW. Customer has sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of Customer Data, and for obtaining all rights related to Customer Data required by Oracle to perform the Services.

**5.2.**    **Oracle Intellectual Property Rights.** All rights, title and interest in and to the Services (including without limitation all intellectual property rights therein and all modifications, extensions, customizations, scripts or other derivative works of the Services provided or developed by Oracle) and anything developed or delivered by or on behalf of Oracle under this Agreement (including without limitation Deliverables and Tools as such terms are defined in the Professional Services Addendum ) are owned exclusively by Oracle or its licensors. Except as provided in this Agreement, the rights granted to Customer do not convey any rights in the Services, express or implied, or ownership in the Services or any intellectual property rights thereto. Customer grants Oracle a royalty free, worldwide, perpetual, irrevocable, transferable right to use, modify, distribute and incorporate into the Services (without attribution of any kind) any suggestions, enhancement request, recommendations, proposals, correction or other feedback or information provided by Customer or any Users related to the operation or functionality of the Services. Any rights in the Services or Oracle's intellectual property not expressly granted herein by Oracle are reserved by Oracle. Oracle, NetSuite and OpenAir service marks, logos and product and service names are marks of Oracle (the "Oracle Marks"). Customer agrees not to display or use the Oracle Marks in any manner without Oracle's express prior written permission. The trademarks, logos and service marks of Third Party Application providers ("Marks") are the property of such third parties. Customer is not permitted to use these Marks without the prior written consent of such third party which may own the Mark.

**5.3.**    **US Government Rights.** The Cloud Service is a "commercial item" as that term is defined at FAR 2.101. If Customer or User is a US Federal Government (Government) Executive Agency (as defined in FAR 2.101), Oracle provides the Cloud Service, including any related software, technology, technical data, and/or professional services in accordance with the following: (a) if acquired by or on behalf of any Executive Agency (other than an agency within the Department of Defense (DoD), the Government acquires, in accordance with FAR 12.211 (Technical Data) and FAR 12.212 (Computer Software), only those rights in technical data and software customarily provided to the public as defined in this Agreement; or (b) if acquired by or on behalf of any Executive Agency within the DoD, the Government acquires, in accordance with DFARS 227.7202-3 (Rights in commercial computer software or commercial computer software documentation), only those rights in technical data and software customarily provided in this Agreement. In addition, DFARS 252.227-7015 (Technical Data – Commercial Items) applies to technical data acquired by DoD agencies. Any Federal Legislative Agency or Federal Judicial Agency shall obtain only those rights in technical data and software customarily provided to the public as set forth in this Agreement. If any Federal Executive Agency, Federal Legislative Agency, or Federal Judicial Agency has a need for rights not conveyed under the terms described in this Section, it must negotiate with Oracle to determine if there are acceptable terms for transferring such rights, and a mutually acceptable written addendum specifically conveying such rights must be included in any applicable contract or agreement to be effective. This U.S. Government Rights Section is in lieu of, and supersedes, any other FAR, DFARS, or other clause, provision, or supplemental regulation that addresses Government rights in computer software or technical data under this Agreement.

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG    Page **3** of **9**
«Subsidiary_Name_Signature_Block» – Confidential Information

-- 21 --

**Subscription Services Agreement**

**6.  Terms of Service.**

**6.1.    Accuracy of Customer's Contact Information.**  Customer shall provide accurate, current and complete information on Customer's legal business name, address, email address and phone number, and maintain and promptly update this information if it should change.

**6.2.    Notice**. Any notice required under this Agreement shall be provided to the other party in writing.  If Customer has a legal dispute with Oracle or if Customer wishes to provide a notice under the Indemnification Section of this Agreement, or if Customer becomes subject to insolvency or other similar legal proceedings, Customer will promptly send written notice to: Oracle America, Inc., 500 Oracle Parkway, Redwood Shores, CA 94065, Attention:  General Counsel, Legal Department.

**6.3.    Users:  Passwords, Access and Notification.**  Customer shall authorize access to and assign unique passwords and user names to the number of Users procured by Customer on the Estimate/Order Form.  User logins are for designated Users and cannot be shared or used by more than one User, but any User login may be permanently reassigned to another User as needed.  Customer will be responsible for the confidentiality and use of User's passwords and user names.  Customer will also be responsible for all Electronic Communications, including those containing business information, account registration, account holder information, financial information, Customer Data, and all other data of any kind contained within emails or otherwise entered electronically through the Cloud Service or under Customer's account.  Oracle will act as though any Electronic Communications it receives under Customer's passwords, user name, and/or account number will have been sent by Customer.  Customer shall use commercially reasonable efforts to prevent unauthorized access to or use of the Cloud Service and shall promptly notify Oracle of any unauthorized access or use of the Cloud Service and any loss or theft or unauthorized use of any User's password or name and/or Cloud Service account numbers.

**6.4.    Transmission of Data.**  Customer understands that the technical processing and transmission of Customer's Electronic Communications is fundamentally necessary to use of the Cloud Service.  Customer is responsible for securing DSL, cable or another high speed Internet connection and up-to-date "browser" software in order to utilize the Cloud Service.  Customer expressly consents to Oracle's interception and storage of Electronic Communications and/or Customer Data as needed to provide the Services hereunder, and Customer acknowledges and understands that Customer's Electronic Communications will involve transmission over the Internet, and over various networks, only part of which may be owned and/or operated by Oracle.  Customer further acknowledges and understands that Electronic Communications may be accessed by unauthorized parties when communicated across the Internet, network communications facilities, telephone or other electronic means.  Without limiting Oracle's applicable obligations under the Security or Confidentiality Sections of this Agreement, Oracle is not responsible for any Electronic Communications and/or Customer Data which are delayed, lost, altered, intercepted or stored during the transmission of any data whatsoever across networks not owned and/or operated by Oracle, including, but not limited to, the Internet and Customer's local network.

**6.5.    Third-Party Applications.**  Oracle or third party providers may offer Third Party Applications.  Except as expressly set forth in the Estimate/Order Form, Oracle does not warrant any such Third Party Applications, regardless of whether or not such Third Party Applications are provided by a third party that is a member of an Oracle partner program or otherwise designated by Oracle as "Built For NetSuite," "certified," "approved" or "recommended."  Any procurement by Customer of such Third Party Applications or services is solely between Customer and the applicable third party provider.  Customer may not use Third Party Applications to enter and/or submit transactions to be processed and/or stored in the Cloud Service, unless Customer has procured the applicable subscription to the Cloud Service for such use and access.

Oracle is not responsible for any aspect of such Third Party Applications that Customer may procure or connect to through the Cloud Service, or any interoperation, descriptions, promises, or other information related to the foregoing.  If Customer installs or enables Third Party Applications for use with the Cloud Service, Customer agrees that Oracle may enable such third party providers to access Customer Data for the interoperation of such Third Party Applications with the Cloud Service, and any exchange of data or other interaction between Customer and a third party provider is solely between Customer and such third party provider pursuant to a separate privacy policy or other terms governing Customer's access to or use of the Third Party Applications.  Oracle shall not be responsible for any disclosure, modification or deletion of Customer Data resulting from any such access by Third Party Applications or third party providers.  No procurement of such Third Party Applications is required to use the Cloud Service.  If Customer was referred to Oracle by a member of one of Oracle's partner programs, Customer hereby authorizes Oracle to provide such member or its successor entity with access to Customer's business information related to the procurement and use of the Cloud Service pursuant to this Agreement, including but not limited to User names and email addresses, support cases and billing/payment information.

**6.6.    Support Services.**  As part of the Cloud Service, Oracle will provide Customer with Help Documentation and other online resources to assist Customer in its use of the Cloud Service.  Oracle also offers optional "for fee" Support Services and Professional Services.

**6.7.    Service Level.**  During the Term, the Cloud Service will meet the service level specified in the "Service Level Commitment" listed on the Oracle website located at www.netsuite.com/slc, or such other URL as specified by Oracle, which

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG                                                     Page **4** of **9**
«Subsidiary_Name_Signature_Block» – Confidential Information

-- 22 --

DocuSign Envelope ID: C3F8D6E9-0E25-1A39-B1EB-6972676598E8    Case 3:21-cv-04361-JCS    Document 1    Filed 06/08/21    Page 23 of 68

**Subscription Services Agreement**

is hereby incorporated by reference.  If the Cloud Service fails to achieve the service level, then Customer will be entitled, as its sole and exclusive remedy, to a credit for the Cloud Service in accordance with the terms set forth in the Service Level Commitment.  The Cloud Service's system logs and other records shall be used for calculating any service level events.

**6.8.**    **Security.**  Oracle shall maintain commercially reasonable administrative, physical and technical safeguards designed for the protection, confidentiality and integrity of Customer Data.  During the Term, Oracle shall maintain PCI DSS compliance for the portions of the Cloud Service that store and process credit card data.  Any changes made to the Cloud Service by the Customer or at the Customer's direction may affect the Customer's compliance with PCI DSS requirements and Customer shall be solely responsible for ensuring that any such changes are compliant with PCI DSS requirements.  For the Cloud Service, Oracle shall perform an annual third-party audit in accordance with the Statement on Standards for Attestation Engagements No. 18 (SSAE 18) and the International Standards for Assurance Engagements No. 3402 (ISAE 3402) and shall obtain a SSAE 18 (SOC 1) / ISAE 3402 Type II Report.  Additionally, Oracle shall perform an annual ISO 27001 audit (or similar security standard) for the Cloud Service, under the International Organization for Standardization (ISO) 27001 standard. No more than once per year, Customer may submit one request for a copy of:  (a) Oracle's final SSAE 18 (SOC 1) / ISAE 3402 Type II Report and (b) Oracle's final ISO 27001 certificate.  If similar third party audits, standards and/or certifications become available in the future, Oracle may choose to perform such audit and/or certify to such established industry standard selected by Oracle in place of those in the preceding sentences.

**6.9.**    **Updates.**  During the Services Period, Oracle may update the Services, the URL Terms and User Guides to reflect changes in, among other things, laws, regulations, rules, technology, industry practices, patterns of system use, and availability of Third Party Applications.  Oracle updates to the Services, the URL Terms or User Guides will not materially reduce the level of performance, functionality, security or availability of the Services during the term of Customer's Estimate/Order Form or SOW.

**6.10.**    **Service Monitoring and Analyses**

**6.10.1.**  Oracle continuously monitors the Cloud Service to facilitate Oracle's operation of the Cloud Service; to help resolve Customer service requests; to detect and address threats to the functionality, security, integrity, and availability of the Cloud Service as well as any content, data, or applications in the Service; and to detect and address illegal acts or violations of the Acceptable Use Policy.  Oracle monitoring tools do not collect or store any Customer Data residing in the Cloud Service, except as needed for such purposes.  Oracle does not monitor, and does not address issues with, non-Oracle software provided by Customer or any of Customer's Users that is stored in, or run on or through, the Cloud Service. Information collected by Oracle monitoring tools (excluding Customer Data) may also be used to assist in managing Oracle's product and service portfolio, to help Oracle address deficiencies in its product and service offerings, and for license management purposes.

**6.10.2.**  Oracle may (i) compile statistical and other information related to the performance, operation and use of the Cloud Service, and (ii) use data from the Cloud Service in aggregated form for security and operations management, to create statistical analyses, and for research and development purposes (clauses (i) and (ii) are collectively referred to as "Service Analyses").  Oracle may make Service Analyses publicly available; however, Service Analyses will not incorporate Customer Data, personal information or Confidential Information in a form that could serve to identify Customer or any individual.  Oracle retains all intellectual property rights in Service Analyses.

**6.11.**    **Data Protection**

**6.11.1.**  In performing the Cloud Services, Oracle will comply with the Oracle Services Privacy Policy, which is available at http://www.oracle.com/html/Services-privacy-policy.html and incorporated herein by reference.  The Oracle Services Privacy Policy is subject to change at Oracle's discretion; however, Oracle policy changes will not result in a material reduction in the level of protection provided for Customer's Personal Data (as defined in Oracle's Data Processing Agreement) provided as part of Customer Data during the term of Customer's Estimate/Order Form.

**6.11.2.**  Unless otherwise provided in the applicable Estimate/Order Form, Oracle's Data Processing Agreement for Cloud Services (the "Data Processing Agreement"), which is available at http://www.oracle.com/corporate/contracts and incorporated herein by reference, describes the parties' respective roles for the processing and control of Personal Data that Customer provides to Oracle as part of the Cloud Services.  Unless otherwise provided in the applicable Estimate/Order Form, Oracle will act as a data processor, and will act on Customer instructions concerning the treatment of Customer's Personal Data residing in the services environment, as specified in this Agreement, the Data Processing Agreement and the applicable Estimate/Order Form.  Customer agrees to provide any notices and obtain any consents related to Customer's use of the Cloud Services and Oracle's provision of the Cloud Services, including those related to the collection, use, processing, transfer and disclosure of Personal Data.

**6.11.3.**  The Data Processing Agreement does not apply to any (1) demonstration accounts, trials, beta releases, release preview or other similar versions of the services or (2) any features, services or products which are provided pursuant to a

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG                                                    Page **5** of **9**
«Subsidiary_Name_Signature_Block» – Confidential Information

-- 23 --

**Subscription Services Agreement**

separate agreement or by a party other than Oracle (e.g. where Oracle is merely a billing/collection agent) including but not limited to Celigo, Pacejet, Actian Dun and Bradstreet, and Coupa.

**7.   Suspension/Termination.**

**7.1.     Suspension for Delinquent Account.**  Oracle reserves the right to suspend Customer's access to and/or use of the Services if any payment is due but unpaid but only after Oracle has provided Customer two (2) delinquency notices, and at least thirty (30) days have passed since the transmission of the first notice.  Customer agrees that Oracle shall not be liable to Customer or other third party for any suspension pursuant to this Section.

**7.2.     Suspension for Ongoing Harm.**  Oracle may suspend Customer's or Users' access to, or use of, the Services if Oracle believes that (a) there is a significant threat to the functionality, security, integrity, or availability of the Services or any content, data, or applications in the Services; (b) Customer or Users are accessing or using the Services to commit an illegal act; or (c) there is a violation of the Acceptable Use Policy.  When reasonably practicable and lawfully permitted, Oracle will provide Customer with advance notice of any such suspension.  Oracle will use reasonable efforts to re-establish the Services promptly after Oracle determines that the issue causing the suspension has been resolved.  During any suspension period, Oracle will make Customer Data (as it existed on the suspension date) available to Customer.  Any suspension under this Section shall not excuse Customer from Customer's obligation to make payments under this Agreement.

**7.3.     Termination for Cause.**  If either Customer or Oracle breaches a material term of this Agreement or any Estimate/Order Form or SOW and fails to correct the breach within 30 days of written specification of the breach, then the breaching party is in default and the non-breaching party may terminate (a) in the case of breach of any Estimate/Order Form or SOW, the Estimate/Order Form and any applicable SOW under which the breach occurred; or (b) in the case of breach of the Agreement, the Agreement and all Estimates/Order Forms and SOWs that have been placed under the Agreement.  If Oracle terminates any orders as specified in the preceding sentence, Customer must pay within 30 days all amounts that have accrued prior to such termination, as well as all sums remaining unpaid for the Services under such Estimates/Order Forms and SOWs plus related taxes and expenses.  Except for nonpayment of fees, the nonbreaching party may agree in its sole discretion to extend the 30 day period for so long as the breaching party continues reasonable efforts to cure the breach. Customer agrees that if it is in default under this Agreement, Customer may not use those Services ordered.

**8.   Confidentiality.**

**8.1**      By virtue of this Agreement, the parties may disclose to each other information that is confidential ("Confidential Information").  Confidential Information shall be limited to the terms and pricing under this Agreement and Customer's Estimate/Order Forms, Customer Data residing in the Cloud Service, and all information clearly identified as confidential at the time of disclosure.

**8.2**      A party's Confidential Information shall not include information that:  (a) is or becomes a part of the public domain through no act or omission of the other party; (b) was in the other party's lawful possession prior to the disclosure and had not been obtained by the other party either directly or indirectly from the disclosing party; (c) is lawfully disclosed to the other party by a third party without restriction on the disclosure; or (d) is independently developed by the other party.

**8.3**      Each party agrees not to disclose the other party's Confidential Information to any third party other than as set forth in the following sentence for a period of five years from the date of the disclosing party's disclosure of the Confidential Information to the receiving party; however, Oracle will protect the confidentiality of Customer Data residing in the Cloud Service for as long as such information resides in the Cloud Service.  Each party may disclose Confidential Information only to those employees, agents or subcontractors who are required to protect it against unauthorized disclosure in a manner no less protective than required under this Agreement, and each party may disclose the other party's Confidential Information in any legal proceeding or to a governmental entity as required by law.  Oracle will protect the confidentiality of Customer Data residing in the Services in accordance with the Oracle security practices applicable to Customer's Estimate/Order Form as described in this Agreement or such Estimate/Order Form.

**9.   Warranties, Disclaimers and Exclusive Remedies.**

**9.1.**      Each party represents that it has validly entered into this Agreement and that it has the power and authority to do so. Oracle warrants that during the Term, Oracle will perform (i) the Cloud Service using commercially reasonable care and skill in all material respects as described in the User Guides, and (ii) any Professional Services and Support Services in a professional manner consistent with industry standards (the warranties described by the foregoing clauses (i) and (ii), collectively, the "Services Warranty").  If the Services provided to Customer were not performed as warranted, Customer must promptly provide Oracle with a written notice that describes the deficiency in the Services (including, as applicable, the service request number notifying Oracle of the deficiency in the Services).  For Professional Services, Customer must notify Oracle of any warranty deficiencies within 60 days from performance of the deficient Professional Services.

**Subscription Services Agreement**

**9.2.**     ORACLE DOES NOT WARRANT THAT THE SERVICES WILL BE PERFORMED ERROR-FREE OR UNINTERRUPTED, THAT ORACLE WILL CORRECT ALL SERVICES ERRORS, OR THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR EXPECTATIONS.   ORACLE IS NOT RESPONSIBLE FOR ANY ISSUES RELATED TO THE PERFORMANCE, OPERATION OR SECURITY OF THE SERVICES THAT ARISE FROM CUSTOMER DATA OR THIRD PARTY APPLICATIONS OR SERVICES PROVIDED BY THIRD PARTIES.

**9.3.**     FOR ANY BREACH OF THE SERVICES WARRANTY, CUSTOMER'S EXCLUSIVE REMEDY AND ORACLE'S ENTIRE LIABILITY SHALL BE THE CORRECTION OF THE DEFICIENT SERVICES THAT CAUSED THE BREACH OF WARRANTY, OR, IF ORACLE CANNOT SUBSTANTIALLY CORRECT THE DEFICIENCY IN A COMMERCIALLY REASONABLE MANNER, CUSTOMER MAY END THE DEFICIENT SERVICES AND ORACLE WILL REFUND TO CUSTOMER THE FEES FOR THE TERMINATED SERVICES THAT CUSTOMER PRE-PAID TO ORACLE FOR THE PERIOD FOLLOWING THE EFFECTIVE DATE OF TERMINATION.

**9.4.**     TO THE EXTENT NOT PROHIBITED BY LAW, THESE WARRANTIES ARE EXCLUSIVE AND THERE ARE NO OTHER EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS INCLUDING FOR SOFTWARE, HARDWARE, SYSTEMS, NETWORKS OR ENVIRONMENTS OR FOR MERCHANTABILITY, SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.

**10.   Limitations of Liability.**

**10.1.**     IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES, OR ANY LOSS OF REVENUE, PROFITS (EXCLUDING FEES UNDER THIS AGREEMENT), SALES, DATA, DATA USE, GOODWILL, OR REPUTATION.

**10.2.**     IN NO EVENT SHALL THE AGGREGATE LIABILITY OF ORACLE AND ITS AFFILIATES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR CUSTOMER'S ESTIMATE/ORDER FORM OR SOW, WHETHER IN CONTRACT, TORT, OR OTHERWISE, EXCEED THE TOTAL AMOUNTS ACTUALLY PAID UNDER CUSTOMER'S ESTIMATE/ORDER FORM OR SOW FOR THE SERVICES GIVING RISE TO THE LIABILITY DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY.

**11.   Indemnification.**

**11.1.**     If a third party makes a claim against either Customer or Oracle ("Recipient" which may refer to Customer or Oracle depending upon which party received the Material), that any information, design, specification, instruction, software, service, data, hardware, or material (collectively, "Material") furnished by either Customer or Oracle ("Provider" which may refer to Customer or Oracle depending on which party provided the Material) and used by the Recipient infringes the third party's intellectual property rights, the Provider, at the Provider's sole cost and expense, will defend the Recipient against the claim and indemnify the Recipient from the damages, liabilities, costs and expenses awarded by the court to the third party claiming infringement or the settlement agreed to by the Provider, if the Recipient does the following:

a.        notifies the Provider promptly in writing, not later than 30 days after the Recipient receives notice of the claim (or sooner if required by applicable law);
b.        gives the Provider sole control of the defense and any settlement negotiations; and
c.        gives the Provider the information, authority and assistance the Provider needs to defend against or settle the claim.

**11.2.**     If the Provider believes or it is determined that any of the Material may have violated a third party's intellectual property rights, the Provider may choose to either modify the Material to be non-infringing (while substantially preserving its utility or functionality) or obtain a license to allow for continued use, or if these alternatives are not commercially reasonable, the Provider may end the license for, and require return of, the applicable Material and refund any unused, prepaid fees the Recipient may have paid to the other party for such Material.  If such return materially affects Oracle's ability to meet obligations under the relevant order, then Oracle may, upon 30 days prior written notice, terminate the order.  If such Material is third party technology and the terms of the third party license do not allow us to terminate the license, then Oracle may, upon 30 days prior written notice, end the Services associated with such Material and refund any unused, prepaid fees for such Services.

**11.3.**     The Provider will not indemnify the Recipient if the Recipient (a) alters the Material or uses it outside the scope of use identified in the Provider's user or program documentation or the User Guides, or (b) uses a version of the Material which has been superseded, if the infringement claim could have been avoided by using an unaltered current version of the Material which was made available to the Recipient.  The Provider will not indemnify the Recipient to the extent that an infringement claim is based upon any Material not furnished by the Provider.  Oracle will not indemnify Customer to the extent that an infringement claim is based on a Third Party Application or any Material from a third party portal or other external source that is accessible or made available to Customer within or by the Services (e.g., a social media post from a third party blog or forum, a third party Web page accessed via a hyperlink, marketing data from third party data providers, etc.).

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG                                                                                Page **7** of **9**
«Subsidiary_Name_Signature_Block» – Confidential Information

-- 25 --

**Subscription Services Agreement**

**11.4.**     This Section 11 provides the parties' exclusive remedy for any infringement claims or damages.

**12.  Governing Law and Jurisdiction**.  This Agreement is governed by the substantive and procedural laws of the State of California and each party agrees to submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties in California in any dispute arising out of or relating to this Agreement.  The Uniform Computer Information Transactions Act does not apply to this Agreement or to orders placed under it.

**13.  Export**.

**13.1**     Export laws and regulations of the United States and any other relevant local export laws and regulations apply to the Services.  Such export laws govern use of the Services (including technical data) and any Services deliverables provided under this Agreement, and Customer and Oracle each agree to comply with all such export laws and regulations (including "deemed export" and "deemed re-export" regulations).  Customer agrees that no data, information, software programs and/or materials resulting from the Services (or direct product thereof) will be exported, directly or indirectly, in violation of these laws, or will be used for any purpose prohibited by these laws including, without limitation, nuclear, chemical, or biological weapons proliferation, or development of missile technology.

**13.2**     Customer acknowledges that the Services are designed with capabilities for Customer and Customer Users to access the Services without regard to geographic location and to transfer or otherwise move Customer Data between the Services and other locations such as User workstations.  Customer is solely responsible for the authorization and management of User accounts across geographic locations, as well as export control and geographic transfer of Customer Data.

**14.  General Provisions.**

**14.1.     Entire Agreement.**

**14.1.1.**  This Agreement incorporates by reference all URL Terms (as applicable), Exhibits and Estimate/Order Forms, and this Agreement, together with such referenced items, constitute the entire understanding between Customer and Oracle and are intended to be the final and entire expression of their agreement.  The parties expressly disclaim any reliance on any and all prior discussions, emails, RFP's and/or agreements between the parties.   There are no other verbal agreements, representations, warranties undertakings or other agreements between the parties.

**14.1.2.**  Under no circumstances will the terms, conditions or provisions of any purchase order, invoice or other administrative document issued by Customer in connection to this Agreement be deemed to modify, alter or expand the rights, duties or obligations of the parties under, or otherwise modify, this Agreement, regardless of any failure of Oracle to object to such terms, provisions, or conditions.  In the event of any inconsistencies between the terms of an Estimate/Order Form and the Agreement, the Estimate/Order Form shall take precedence; however, unless expressly stated otherwise in an Estimate/Order Form, the terms of the Data Processing Agreement shall take precedence over any inconsistent terms in an Estimate/Order Form.

**14.1.3.**  The Agreement shall not be modified, or amended, except as expressly set forth herein, or in writing and signed or accepted electronically by the party against whom the modification, amendment or waiver is to be asserted, or by a properly executed Estimate/Order Form or Statement of Work.  Notwithstanding the above, after execution of this Agreement, and during the electronic provisioning of Customer's account, Customer will be presented with the requirement to "agree" to a click through agreement pertaining to "Main Terms of Service" or "Terms of Service" for the Cloud Service before Customer's account can be successfully provisioned.  Oracle hereby expressly agrees that upon execution of this Agreement such "Main Terms of Service" shall be considered null and void and shall not apply in any manner to this Agreement.   Customer acknowledges that other click through agreements found at www.netsuite.com/termsofservice (or other similar sites) shall apply if optional services or features are subsequently ordered or activated.  For clarity, such other click through agreements will only apply to such optional services or features.

**14.2.     Other General Provisions.**

**14.2.1.**  This Agreement shall inure to benefit and bind the parties hereto, their successors and assigns, but neither party may assign this Agreement without written consent of the other, except that Oracle may assign without consent to a related entity or the successor of all or substantially all of the assignor's business or assets to which this Agreement relates.  There are no third-party beneficiaries to this Agreement.

**14.2.2.**  This Agreement does not create any joint venture, partnership, agency, or employment relationship between the parties.

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG
«Subsidiary_Name_Signature_Block» – Confidential Information

Page **8** of **9**

-- 26 --

**Subscription Services Agreement**

**14.2.3.** Oracle's business partners and other third parties, including any third parties with which the Services have integrations or that are retained by Customer to provide consulting services, implementation services or applications that interact with the Services, are independent of Oracle and are not Oracle's agents. Oracle is not liable for, bound by, or responsible for any problems with the Services or Customer Data arising due to any acts of any such business partner or third party, unless the business partner or third party is providing Services as Oracle's subcontractor on an engagement ordered under this Agreement and, if so, then only to the same extent as Oracle would be responsible for our resources under this Agreement.

**14.2.4.** If any provision is held by a court of competent jurisdiction to be contrary to law, such provision shall be eliminated or limited to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect. A waiver of any breach under this Agreement should not constitute a waiver of any other breach or future breach.

**14.2.5. Force Majeure.** Neither party shall be liable for loss, delay, nonperformance (including failure to meet the service level commitment but excluding payment obligations) to the extent resulting from any force majeure event, including, but not limited to, acts of God, strike, riot, fire, explosion, flood, earthquake, natural disaster, terrorism, act of war, civil unrest, criminal acts of third parties, failure of the Internet, governmental acts or orders or restrictions, failure of suppliers, labor stoppage or dispute (other than those involving Oracle employees), or shortage of materials, provided that such party uses reasonable efforts, under the circumstances, to notify the other party of the circumstances causing the delay and to resume performance as soon as possible and any delivery date shall be extended accordingly.

**14.2.6. Non-Impediment.** Nothing in this Agreement shall be construed as precluding or limiting in any way the right of Oracle to provide consulting, development, or other services of any kind to any individual or entity (including without limitation performing services or developing materials which are similar to and/or competitive with the Professional Services and/or deliverables hereunder).

**14.2.7. Audit.** Upon forty-five (45) days written notice and no more than once every twelve (12) months, Oracle may audit Customer's use of the Cloud Services to ensure Customer's use of the Cloud Services is in compliance with the terms of the applicable Estimate/Order Form and this Agreement. Any such audit shall not unreasonably interfere with Your normal business operations. Customer agrees to cooperate with Oracle's audit and to provide reasonable assistance and access to information reasonably requested by Oracle. The performance of the audit and non-public data obtained during the audit (including findings or reports that result from the audit) shall be subject to the provisions of section 8 (Confidentiality) of this Agreement. If the audit identifies non-compliance, Customer agrees to remedy (which may include, without limitation, the payment of any fees for additional Cloud Services) such non-compliance within 30 days of written notification of that non-compliance. Customer agrees that Oracle shall not be responsible for any of Customer's costs incurred in cooperating with the audit.

**14.2.8.** The Section headings used in this Agreement are included for reference purposes only and shall not affect the meaning or interpretation of this Agreement in any way. Provisions that survive termination or expiration of this Agreement are those relating to limitation of liability, indemnification, payment and others which by their nature are intended to survive. This Agreement may be executed in counterparts and/or by facsimile or electronic signature and if so executed shall be equally binding as an original copy of this Agreement executed in ink by both parties.

THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ THIS AGREEMENT, UNDERSTAND IT AND AGREE TO BE BOUND BY ITS TERMS, AND THE PERSON SIGNING ON BEHALF OF EACH HAS BEEN AUTHORIZED TO DO SO. IF THE PERSON SIGNING BELOW AS CUSTOMER IS ENTERING INTO THIS AGREEMENT ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, SUCH PERSON REPRESENTS THAT HE OR SHE HAS THE AUTHORITY TO BIND SUCH ENTITY AND ITS AFFILIATES TO THESE TERMS AND CONDITIONS.

| | |
|---|---|
| **CUSTOMER NAME:** Advance Life, Inc. | **ORACLE AMERICA, INC.** |
| **Authorized Signature:** *Hank Renken*<br>7B3379328859438... | **Authorized Signature:** *Levy, Samuel J*<br>321F9703B2704B3... |
| **Print Full Name:** Hank Renken | **Print Full Name:** Levy, Samuel J |
| **Job Title:** President | **Job Title:** Sr. Vice President of Sales, Americas |
| **Signature Date:** 28 October 2019 \| 12:23 PDT | **Signature Date:** 28 October 2019 \| 12:30 PDT |

Cloud_Oracle Subscription Services Agreement_v071219_US_ENG    Page **9** of **9**
«Subsidiary_Name_Signature_Block» – Confidential Information

-- 27 --

# EXHIBIT 2



# Statement of Work

## Proposal for Team-Based Engagement for



October 2019



## Table of Contents

*1*    ***Project Scope Summary***..............................................................................*3*

    **1.1**    **Business Background** .............................................................**3**

    **1.2**    **Brief about Advance Lifts requirements**...............................**3**

*2*    ***Team Composition***........................................................................................*4*

*3*    ***Proposed Team & Cost*** ...............................................................................*5*

*4*    ***Billing*** ..............................................................................................................*6*

*5*    ***Project Assumptions***...................................................................................*6*

*6*    ***Project Dependencies***.................................................................................*7*

*7*    ***Risk Management and Reporting*** ...........................................................*8*

*8*    ***APPENDIX: About Folio3***...........................................................................*9*



# 1   Project Scope Summary

This SOW covers the engagement of Folio3 team-based resources to support Advance Lifts in implementing NetSuite standard and custom functionality.

## 1.1   Business Background

*"Our state of the art 120,000 square foot building houses all operations including sales, design and manufacturing. Our company is ISO 9001:2015 certified and we also have an UL listed panel shop in-house.*

*Advance Lifts was founded in 1974 and quickly became the leading dock lift manufacturer in the country. We have maintained that position through innovative design, quick deliveries and superior service. Our goal is to make the entire process of buying, installing, using and servicing of our products, as easy and trouble free as possible for each and every customer."*

https://www.advancelifts.com/

## 1.2   Brief about Advance Lifts requirements

Advance Lifts requires dedicated resource to be deployed for advisory and development services around:

- Development of custom records
- Development of custom forms / PDF print forms
- NetSuite custom automations / scripts
- Development of Reports / Dashboards
- Custom NetSuite Workflows

The Advance Lifts requirements which can be met through customizations are:

- Creation and Data Migration of Historical Quote Records which will contain all relevant attributes stored in Quotes within the legacy Advance Lifts custom Quoting tool. Historical Quote Records will be searchable within NetSuite.
- Creation of a custom Quoting tool within the standard NetSuite Quote form:
  - The user will select a Model Number (Item) as a starting point and baseline for the Quote
  - The user will then be able to select the relevant options within one or several custom subtabs within the NetSuite Quote form.
  - Each Option will be tied to an Item in NetSuite. This will allow Advance Lifts to easily maintain the description, sales price and estimated cost of each option. The general category of the quoted model (LTT / DOK, Mezzanine, Enclosure…) will drive which option fields are visible / selectable or not.
  - A script will convert as needed the options selected within the form into the relevant line items within the standard line item information of the NetSuite Quote. The first line will always contain the Item for the Model Number and



its relevant price. The user will be able to directly update all line Item data (description, sales price, estimated cost...).

o   At least 3 variations of a custom PDF form for this Quote will be developed to match Advanced Lifts requirements. The relevant variation will be driven by the general category of the quoted model

Other requirements for relevant Folio3 services may be defined by Advance Lifts within this statement of work.

Folio3 services will typically be delivered in the following manner:

- An Advance Lifts Project Owner/stakeholder will define a list of requirements along with their priority

- The Folio3 Technical Consultant will plan to execute the work based on the defined requirements

- The Folio3 Technical Consultant will analyze the requirements and coordinate with Technical Consultant for any requirement requiring customization

## 2   Team Composition

**Advance Lifts**

<u>Project Owner</u>: Advance Lifts will assign a dedicated and committed Project Owner (an Executive Stakeholder) for the entire duration of this project who will:

a) Provide requirements signoff on their behalf

b) Work actively with Folio3 Team as their single point of contact to answer any queries, resolve issues and manage/ mitigate risks and

c) Ensure that final project closure related activities like UAT and Sign Off are completed within their allotted quota of time.

***The pricing and schedule reflect this important assumption.***

***The customer is responsible for providing and ensuring customer's committed participation of resources required during the Project. The pricing and schedule reflect this important assumption.***

***This SOW assumes that the implementation of the Service under this SOW is performed jointly with customer as a cooperative, hands-on Project, jointly managed by Folio3 and the customer pursuant to a shared consulting model for performing an implementation.***



*Folio3 will show customer how to configure and maintain the system, as described in this SOW. As an example, Folio3 will show how to create a custom field in order for customer to enter their remaining custom fields into the Service. This is a fundamental principle of the Implementation Project approach – Shared project responsibility.*

**Folio3:**

**For Implementation**

> <u>1 Offshore Technical Consultant</u> – The Technical Consultant will also be responsible to work on any forms, scripts, reports, or workflow customization requirements assigned by Advanced Lifts.

# 3   Proposed Team & Cost

Advance Lifts has requested to allocate dedicated functional and technical resources as follows:

### Monthly Cost

| S. # | Description | Cost |
|------|-------------|------|
| 1 | Offshore Technical Consultant @ 100% allocation | $6,200 Per month |
|  | **Total Cost per month** | **$6,200 Per month** |

### Team Based Engagement Guidelines

- **Validity:** Folio3 will allocate the above-mentioned resources for a minimum duration of 3 months and a start date agreed upon with Advanced Lifts. This SOW will automatically continue beyond 3 months unless Advance Lifts notifies Folio3 30 days in advance of their wish to discontinue this engagement after 3 or more months.

- Any work performed by offshore resources outside the Team Based allocations listed above will be charged at $50/hour and billed monthly for the duration of this engagement

**MISCELLANEOUS:**
Please note that the above does not include:
- NetSuite License costs and any add- on modules (handled by NetSuite Sales)
- User manuals or technical manuals



- Additional software costs

# 4   Billing

- Folio3 will invoice the first month's cost ($6,200) as the engagement initiation fee.
- Folio3 will invoice Advance Lifts at the end of each month. This invoice will be based on the resources that are listed in the Proposed Team & Cost section above. For the work performed by offshore resources outside the Team Based allocations listed above or performed by a resource added to the team during the month, the prorated time he / she spent that month will be charged in the monthly invoice. The engagement initiation fee will be adjusted from the first month's invoice.
- All invoices are due within 15 days of invoice date, except for the first invoice, which is due immediately.
- Any invoices not paid within 45 days of invoice date will incur a 3% per month penalty.

# 5   Project Assumptions

1. SOW Expiry: The terms and conditions and pricing listed in this SOW shall be valid starting from the date this SOW is provided by Folio3 to customer and will expire thirty (30) days from such date, unless executed by the Parties.
2. Communication:
   a. **Project Manager**: Advance Lifts will assign a Project Manager/Project owner who will coordinate and communicate with Folio3's point of contact and will be the signoff authority from their side. Additionally, resource(s) with Executive Sponsor and adoption champion roles will be required from Advance Lifts.
   b. **Basecamp**: For project management and team coordination, standard tools like Basecamp that are being used in Folio3 will be used for this project. In case of any specific requirement, a separate request shall be made. Advance Lifts will bear any additional cost for the setup and usage of any such tool.
3. Delivery of Professional Services:
   a. **Remote Professional Services:** The Professional Services outlined in this SOW will be provided remotely in English (whether verbally or in writing), with communication via telephone, email and web conference.
   b. **Cancellation / Postponement:** NetSuite and Customer shall use commercially reasonable efforts to attend all scheduled Project meetings. The repeated cancellation of Project meetings may result in Project delay and additional costs.
4. Scope of Services:
   a. **Licenses Procurement and Acceptance of Terms:**  Any rights for customer to use the Service (including without limitation any Service functionalities, products, modules and features) are outside the scope of this SOW and must be separately procured by customer from NetSuite. Additionally, customer is responsible for



separately procuring, at its own expense, all necessary rights for its and/or NetSuite's use of any customer or third party technology that will be used within the scope of this SOW, including any applications and/or services with which the Service can be connected through integration

   b. **Consistent Processes:** Customer is responsible for ensuring that common, consistent and functional processes exist across the organization.

   c. **Future Product Release:** This SOW does not include time for management of the release process, analysis or implementation of functions and features that are not available within the current general release of the Service.

5. Project Staffing:

   a. **Customer Resources Availability:** Project timeline estimates are based on availability of Customer resources and key decision makers.  Lack of access or change to project stakeholders will impact project timelines and costs if decisions cannot be made in timely fashion.

   b. **Administrator:** The Administrator role on the project is critical to the success of the Project and long term adoption of the Service.  The Administrator is to be in place prior to the start of the Project and remain for the duration of the engagement.

6. Project Schedule:

   a. **Timeliness of Responses:** Customer is responsible for acknowledging and responding to documents/queries relating to this Project

   b. A resource will be assigned to work with Advance Lifts and will be deallocated if there is a break in the project. There is no guarantee that the same resource will be available or that a resource will be available in a timely manner if there is a break in the work.

7. Suite Solutions

   a. Customer is responsible for separately procuring the right to use Suite Solutions. The fees for the use/access to Suite Solutions are not within the scope and/or costs described in this SOW.   Please note Folio3 is not responsible for maintenance or support of Suite Solutions.

# 6   Project Dependencies

The project is dependent on the following:

1. Advance Lifts will resolve all queries and feedback requests within shortest possible time. This is necessary for timely execution and completion of project.

2. Advance Lifts will provide timely access of their relevant systems and data to Folio3.



## 7   Risk Management and Reporting

The primary method of risk management will be to create a detailed project plan and keep track of the weekly progress. Any deviations from plan will be immediately notified to Advance Lifts and alternatives such as an increase in timeline, reduction in scope, or a phased delivery approach will be agreed upon between the two parties.

**IN WITNESS WHEREOF, the parties have executed this Statement of Work on the date first set forth above.**

AGREED:
**Advance Lifts**                                    **Folio3 Software, Inc.**

By: _____          By: _____
Name:                                                     Adnan H. Lawai
Title:                                                      CEO



## 8   APPENDIX: About Folio3

**Folio3 at a Glance:**

- 350 Employees across USA, Canada, Eastern Europe, South Asia
- Experienced Leadership:
  - Umair Khan, Executive Chairman (SecretBuilders, Intel, Clickmarks, The Entrepreneurs' Fund; BS & MS MIT)
  - Adnan Lawai, CEO (formerly at General Instrument, SGI, Clickmarks; BS/MS MIT)
  - Ali Rashid, VP Engineering (Formerly Tradekey, Schlumberger, Cable & Wireless, CresSoft)
  - Syed Abdul Nasir, Director of NetSuite Practice (Formerly Clickmarks)
- A leading NetSuite SDN Partner with a focus on NetSuite implementation, customization and integration
  - NetSuite practice since 2008
  - Delivered 200+ NetSuite solutions globally
  - NetSuite's premier partner for mobility
- NetSuite Practice – Areas of Focus:
  - Enterprise
    - NetSuite enterprise applications
    - NetSuite integration
    - Custom development
  - Mobile
    - NetSuite mobile apps – SuiteMobile (iOS), NSDroid (Android)
    - Custom NetSuite app development
  - Web
    - NetSuite & third party platform Integration – eBay, Magento, MessageMedia
    - eCommerce websites - Webstore design & development, integration & customization



**NetSuite Shared Implementation:**

  

**Some of our NetSuite Customers:**

   

  

  

  

 

    

# EXHIBIT 3



**NOTIFICATION OF ASSIGNMENT**

December 16, 2019

Al Boriss
Advance Lifts, Inc.
701 Kirk Rd
Saint Charles, IL   60174
US

Dear Al Boriss:

This letter serves as Notification of Assignment of payments and rights under subject Contract to Banc of America Leasing & Capital, LLC ("Assignee").  Capitalized Terms in this notice shall have the same meanings as in the Contract.

**Contract:** Schedule No. 112642, dated 28-Oct-19

**Assigned Payments and Rights:** Payment Amounts and other sums due under the Contract, including any Taxes paid through the Contract, commencing with the payment due 01-May-20, have been assigned to Assignee (see below).  Assignee assumes all responsibility regarding the collection of the above mentioned amounts.  In addition, all rights to enforce remedies under the Contract have been assigned, giving Assignee the independent right to exercise its rights under the Contract.

| | |
|---|---|
| **Assignee:** | Banc of America Leasing & Capital, LLC |
| | 135 South LaSalle Street |
| | Chicago, IL  60603 US |
| Contact: | Customer Service |
| Phone: | 800-959-5936 |
| Email: | Customersvc@leaseadmincenter.com |

**Payment Remittance Information**:  All assigned payments should be remitted to the address below.[1]

| **Wire Remit To:** | | **Check Remit To:** | |
|---|---|---|---|
| For Benefit of / Payee: | Banc of America Leasing & Capital, LLC | For Benefit of / Payee: | Banc of America Leasing & Capital, LLC |
| Bank: | Banc of America Leasing & Capital, LLC | Bank: | Banc of America Leasing & Capital, LLC |
| Currency: | USD | Address: | Lease Administration Center, P.O. Box 405874 |
| Account No: | 12573-54255 | | |
| ABA | 026-009-593 | | Atlanta, GA  30384-5874 US |

**Customer Rights:** Except as specified under the Contract, Customer's rights and remedies against Supplier under the Order shall not be affected.  Assignee assumes none of Supplier's obligations under the Order. Any questions surrounding the System should continue to be directed to your sales representative.

**Instructions:  Please notify your Accounts Payable department by forwarding a copy of this letter**.

Please contact Alyssa Hansen at alyssa.h.hansen@oracle.com or 650 5069284 if you have any further questions regarding this notification.

Sincerely,

Thomas Marquis
Regional Operations Representative

cc: Banc of America Leasing & Capital, LLC

[1]Assigned payments that are remitted to an account different from the remittance information may not be forwarded in a timely manner to Assignee. Customer shall be solely responsible for any resulting late fees.

NOA (NAS) 24Apr18i

DocuSign Envelope ID: C3F6D6E9-CF25-4A39-B1EB-C872E670598F

# ORACLE

**Payment Schedule**

**(Software)  No.   112642**

| Customer: | Advance Lifts, Inc. |
|---|---|
| Address: | 701 Kirk Rd |
| | Saint Charles IL 60174 |
| Contact: | |
| Phone: | |
| Email Notice: | |
| Order: | Estimate # 659880 |
| PPA No.: | 15292        Dated:  28 OCT 19 |

**Executed by Customer (authorized signature):**

Signature: *Hank Renken*

Name: Hank Renken

Title: President

**Executed by Oracle Credit Corporation:**

Signature:

Name: Lisa Strickland

Title: OFD Field Operations Manager

Contract Effective Date: 29 OCT 19    NAS Operations

---

**System Price:**

| | |
|---|---|
| NetSuite Subscription Services: | $334,722.84 |
| **Total:** | **$334,722.84** |

**Payment Schedule:**

| Payment Amount: | Due Date: |
|---|---|
| 30 @ $6,694.46 | Monthly from 01-May-20 through 01-Oct-22 |
| 24 @ $5,578.71 | Monthly from 01-Nov-22 through 01-Oct-24 |
| 54 payments due as set forth above. | |

---

**Taxes:**  An amount equal to Taxes shall be payable through the Contract with each Payment Amount.  The Supplier shall issue invoice(s) as per the Order and Taxes shall be charged at the applicable tax rate on invoice date.

---

**Transaction Specific Terms (any terms specified in this section will supersede inconsistent terms elsewhere in the Contract):**

---

This schedule ("Schedule") is entered into by Customer and Oracle Credit Corporation ("OCC") for the acquisition of the System from the applicable Supplier. This Contract replaces Customer's payment obligation when due under the Order to Supplier to the extent of the System Price listed above and Customer agrees to pay the System Price on an installment basis.  This Schedule incorporates by reference the terms and conditions of the above-referenced PPA for a separate Contract.  Any reference to "Order" or "Agreement" in this Contract shall mean the above-referenced Order, together with any other agreement governing Customer's right in the System.  Each component of the System specified herein is further described in the Order. Cloud services are subscription rights, which may include SaaS, PaaS or IaaS, that are paid through this Contract.  The System includes any cloud services that replace the cloud services included in the System, and the Order includes orders for such replacement cloud services.  The System Price is the amount set forth above for the items that are paid for through this Contract.

**A.  SYSTEM:**  For the purposes of this Contract, the software, services, and cloud services are accepted.  Upon delivery of the System, if the total amount invoiced by Supplier is less than the fees specified in the Order, then OCC will decrease the System Price and Payment Amounts accordingly.  If any portion of the System has not been delivered (or, for cloud services, the services period has not commenced) 45 days after the Contract Effective Date, then OCC may, with written notice, remove the fees for that portion from the System Price and reduce the Payment Amounts by the amount attributable to that portion of the System.  OCC and Customer may agree to mutually acceptable terms and enter into a new, separate Contract for any portion of the System that was removed from this Contract; otherwise, Customer will pay the Supplier for the removed portion as per the Order.  Until all sums due under this Contract are paid, Customer agrees that Customer's access to use all cloud services provided under the Order, including any renewals or extensions (and their replacements), are subject to Customer's full performance of the terms of this Contract.  Before any part of the System is converted, replaced or traded in by Customer or any other party, Customer shall contact Operations to make arrangements to fulfill all its financial obligations under the Contract.

If the System Price includes fees for renewal periods of services after the first period of services (as such period is defined in the Order), such services will be "Renewal Services" and will be ordered through this Contract.  At the start of each Renewal Services period, Renewal Services for that period will become a part of the System and are accepted for purposes of Customer's payment obligations under the Contract.  Renewal Services fees (and applicable Taxes) will be paid to Supplier (pursuant to the Supplier invoice) through this Contract, from the Payment Amounts (and applicable Taxes) received in the applicable Renewal Service period.  Future increases in fees for Renewal Services (if any) are not included in the System Price or Payment Amounts, and shall be due separately to the applicable Supplier from Customer.  Each Payment Amount (net of fees for Renewal Services, if any) is comprised of a proportional amount of each component of the System Price (net of total fees for Renewal Services, if any).  The term Order also includes orders (in whatever form) for Renewal Services included in the System.

If Supplier reduces the Order fees due to Customer's termination of cloud services, Customer will promptly notify Operations, and any fees for the terminated services that are not yet due under the Order as of the effective date of termination shall be the "Reduction Amount."  The Reduction Amount will be removed from the System Price and applied to reduce the last Payment Amount, and if it exceeds the last Payment Amount, any excess amounts will be applied to each preceding Payment Amount until the Reduction Amount has been fully utilized.  Customer may claim a refund from Supplier for fees for terminated services already due under the Order, if any.  The refund will not include fees not yet due under the Order.  If the System does not include software or hardware, then on the effective date of termination, all remaining Payment Amounts (as adjusted for the Reduction Amount) will become due.

**B.  ADMINISTRATIVE:**  Customer agrees that OCC may insert the appropriate administrative information to complete the Contract, and OCC will provide a copy of the Contract upon request.  For this Contract, the discount rate in the Remedies Section of the PPA shall be the lesser of the rate in the Contract or 2% (the "Index Rate").  OCC will countersign this Schedule upon Customer's delivery of a fully executed Order, PPA, and any other documentation required by OCC (in form and substance acceptable to OCC), and upon such countersignature, the Contract will be effective as of the Contract Effective Date.  All notices or contact for Operations shall be sent to ofd-notice_ww@oracle.com.

---

PS (SW) _US 19Oct12 update 09Jan18i

DocuSign Envelope ID: C3F6D6E9-CF25-4A39-B1EB-C872E670598F

# ORACLE®

# Payment Plan Agreement

| Customer: | Advance Lifts, Inc. |
|---|---|
| Address: | 701 Kirk Rd |
| | Saint Charles IL 60174 |
| PPA No.: | 15792 |
| Effective Date: | 28 oct 19 |

**Executed by Customer (authorized signature):**

Signature: *Hank Renken*

Name: Hank Renken

Title: President

**Executed by Oracle Credit Corporation:**

Signature: *[signature]*

Name: Lisa Strickland

Title: OFD Field Operations Manager
NAS Operations

This Payment Plan Agreement ("PPA") is entered into by Customer and Oracle Credit Corporation ("OCC") for payment of Customer's acquisition of the System. Each Schedule will incorporate the terms of this PPA to form a single contract ("Contract") and provide transaction specific information, including the System Price and the System. The System is acquired from Oracle Corporation, one of its affiliates, an authorized distribution partner or any other party providing the System (each, a "Supplier"). Customer has acquired the System from the applicable Supplier pursuant to the Order, which is subject to an agreement (together, the "Order") governing the terms and conditions of Customer's right in the System. The Order will be specified in the Schedule. Customer agrees that the System consists of all products and services included in the Order for which fees are included in the System Price, together with software upgrades, and updates received from support related to the System ("System"). Customer retains its right against Supplier under the Order to make any claims and therefore agrees to make such claims solely against the Supplier. Except as provided under this Contract, such rights and Customer's remedies against Supplier under the Order, including Supplier's warranty provisions, shall not be affected.

**1.   PAYMENT SCHEDULE:** Customer agrees to pay the Payment Amounts in accordance with the Contract.  If full payment of each Payment Amount and other amounts payable is not received within 10 days of the applicable Due Date, Customer agrees to pay interest from the Due Date on the overdue amount at the rate equal to the lesser of 1.5% per month, or the maximum amount allowed by law.  Taxes will mean any applicable sales, use, property, value added tax or any other tax or charge allocable to the System, Order or the Contract ("Taxes"). Unless stated otherwise, Payment Amounts exclude Taxes. Any amounts payable under the Order, which are not paid through this Contract, are payable by Customer pursuant to the Order.  Customer's obligation to remit Payment Amounts and applicable Taxes paid through this Contract to OCC in accordance with this Contract is absolute, unconditional, non-cancellable, and independent, and shall not be subject to any set-off, recoupment, claim or defense for any reason, including, but not limited to, any termination of or dispute arising under the Order or any related agreements, or performance of the System, or any claim(s) against Supplier.

**2.   DEFAULT:** Any of the following will constitute a Default under the Contract: (a) Customer fails to pay when due any sums due under any Contract; (b) Customer fails to perform any material obligation or breaches any representation in any Contract; (c) Customer no longer has the right to use any part of the System as a result of a material breach of an agreement with Supplier or termination of Customer's right to use any part of the System; and (d) Customer ceases business, or becomes insolvent or is subject to bankruptcy, reorganization or insolvency proceedings.

**3.   REMEDIES:** In the event of a Default that is not cured within 30 days of its occurrence, OCC or its Assignee may: (i) require an amount equal to the sum of all amounts then due and owing, and the unpaid remaining Payment Amounts specified in the Contract (discounted at the lesser of the rate in the Contract or the Index Rate specified in the Schedule per annum simple interest) to become immediately due and payable; (ii) terminate all of Customer's rights to use the System and related support and (iii) pursue any other rights or remedies legally available.  Upon termination of the right to use the System, Customer shall cease use and return the System as directed by OCC and promptly deliver to OCC a certificate of non-use

signed by an authorized signatory.  Customer agrees that if Customer does not pay under the Contract, then pursuant to the Order, Supplier is not obliged to continue providing services that are a part of the System. If OCC or its Assignee takes any action related to claims under the Contract, Customer shall pay, in addition to the amounts due above, all costs and expenses of such action including reasonable attorneys' fees. Failure or delay by OCC or its Assignee to exercise any right or remedy will not operate as a waiver thereof, or of any breach, and all remedies are cumulative and not exclusive. Customer acknowledges that no party shall license, lease, transfer or use any software or other licensed products included in the System in mitigation of damages resulting from Customer's Default, except as allowed under the Order, subject to applicable law.

**4.   ASSIGNMENT:** Customer consents to the sale or assignment of all or a portion of OCC's rights in the Contract or in the System, including the right to exercise remedies, to third parties ("Assignee"). Assignee will not assume any of Supplier's obligations under the Order. Customer shall pay all amounts due under the Contract, and agrees that it shall not assert against Assignee any claim, defense, or setoff that Customer may have against Supplier or OCC. Customer waives all rights to make any claims against Assignee for any loss, damage of the System or breach of any warranty, express or implied with respect to the System, including the System and service performance, functionality, features, and warranties of merchantability and fitness for a particular purpose, if any, or any indirect, incidental or consequential damages or loss of business.

**5.   MISCELLANEOUS:** Customer represents and warrants that this Contract has been duly authorized and constitutes a legal, valid and binding agreement of the Customer.  Customer agrees that it will not assert that any terms in the Order or related agreement (including subsequent amendments) affect its payment obligation or OCC's rights under the Contract and in the System.  Any transfer of obligations under this Contract shall require OCC's and Assignee's prior written consent.  A transfer shall include a change in majority ownership of Customer.  Until all sums due under the Contract have been paid, the System remains subject to the Contract.  Customer agrees, with respect to the Contract, to promptly execute and deliver any ancillary documents (including acceptance certificates, confirmation of delivery, proof of authorization, notices of assignment, and any agreement related to the System) and take further actions, such as registrations and filings, as OCC or Assignee may reasonably request. Customer agrees to provide OCC or Assignee copies of its financial statements or other financial information as OCC or Assignee may reasonably request.  The Contract constitutes the entire agreement between Customer and OCC regarding the subject matter herein, and is separate from, and will supersede any inconsistent terms set forth in the Order, any supply agreement, Customer purchase orders and all prior oral and written understandings.  Capitalized terms not defined herein will have the meaning set forth in the Schedule. If any provision of the Contract is invalid, such invalidity will not affect the enforceability of the remaining terms of the Contract.  Customer shall provide all notices, including bankruptcy or administrative notices, to Operations as specified in the Schedule.  All parties may treat executed faxes, scanned images, or photocopies as original documents.  The Contract may be executed in counterparts, which, when taken together, will constitute a completely executed copy of the Contract. This Contract will be governed by the laws of California.

PPA_US 19Oct12 update 21Mar14i

# ORACLE® NETSUITE

**Invoice # 819355**

500 Oracle Parkway
Redwood Shores, CA 94065
United States
800 762 5524
Tax ID No.: 94-2805249

**Bill To**
Advance Lifts, Inc.
701 Kirk Rd
Saint Charles IL 60174-3428
United States

**Ship To**
Advance Lifts, Inc.
701 Kirk Rd
Saint Charles IL 60174-3428
United States

| Invoice Date | Terms | Due Date | Sales Rep |
|---|---|---|---|
| 29 October 2019 | Net 30 | 28 November 2019 | Oppe, Kevin M |
| **Currency** | **FX Rate** | **PO #** | **Estimate #** |
| USD | 1 | | Estimate #659880 |

Page 1 of 3

| Item | Description | Quantity Ordered | Quantity Billed | Amount |
|---|---|---|---|---|
| NetSuite SuiteSuccess Manufacturing Prm Cloud Service | NetSuite SuiteSuccess Manufacturing Prm Cloud Service includes:<br>** ERP with G/L, Accounts Payable, Purchasing, Inventory, Order Entry, A/R, Expense Reporting, Advanced Shipping with integrated shipping depending on your location, use of Fulfillment Requests and Automatic Location Assignment for up to 5000 orders annually.<br>** NetSuite CRM Sales Force Automation with quote and order management, Marketing Automation with campaigns; Customer Service/Support<br>** Productivity tools including contacts/calendar/events<br>**NetSuite Subsidiary Management within customer's home country for a single currency. Additional countries require separate purchase of OneWorld<br>** NetSuite Work Orders and Assemblies Cloud Service<br>** NetSuite Inventory Management Cloud Service<br>** NetSuite Financial Management Cloud Service<br>** NetSuite Procurement Cloud Service<br>** NetSuite Demand Planning Cloud Service<br>** NetSuite Manufacturing WIP and Routings Cloud Service<br>** NetSuite Fixed Asset Management Cloud Service<br>** Real-time Dashboards with key business metrics, report snapshots<br>** Customer, Vendor and Partner Center logins<br>** 5 Employee Self-Service Users<br>** NetSuite Basic Customer Support. Current URL Terms for support are located at www.netsuite.com/supportterms.<br>** 30,000 integrated bulk mail merges per month<br>** 120,000 campaign emails per year with no single blast exceeding 10,000 recipients<br>** 10 GB File Cabinet and 10 GB Data storage per account | 1 | 0.2 | $71,988.00 |
| NetSuite General Access Cloud Service User | General access user for NetSuite. | 40 | 8 | $47,520.00 |
| Customer Learning Cloud Support Pass-Premium-1 user | Customer Learning Cloud Support Pass for 1 user. The Customer Learning Cloud Support Pass contains online access to the courses included as detailed in the http://www.netsuite.com/termsofservice description (for the number of specified users for the contract term (each person is a "confirmed user"). These training services shall be provided pursuant to the Customer Learning Cloud Support Pass terms and conditions found at http://www.netsuite.com/termsofservice. By signing this Estimate/Order Form, you agree to be bound by the Customer Learning Cloud Support Pass terms and conditions. | 1 | 0.2 | $7,980.00 |
| Subtotal | | | | $127,488.00 |
| Discount | Discount | | | $-66,281.01 |
| Subtotal | | | | $61,206.99 |

| Item | Description | Quantity Ordered | Quantity Billed | Amount |
|------|-------------|------------------|-----------------|--------|
| NetSuite Sandbox Environment Cloud Service | Sandbox Environment for NetSuite Customers<br>** Replicates production environment including data and customizations<br>** Isolated environment – changes shielded from live production account<br>** One production environment replication for each month of term is included<br>** Administrators may provide sandbox access to all production users as needed<br>Development Environment<br>** Access to Development Environments includes 3 distinct accounts with no data<br>** Isolated environment – changes shielded from live production account.<br>** 10 full access users per Development account<br>** 10 GB File Cabinet and 10 GB Data storage per account<br>** Same features and Cloud Service as the production account<br>** Accounts cannot be used for production purpose<br><br>NetSuite uptime guarantee does not apply to Sandbox and Development Environments. | 1 | 0.2 | $11,950.80 |
| Subtotal | | | | $11,950.80 |
| Discount | Discount | | | $-6,213.22 |
| Subtotal | | | | $5,737.58 |

| | |
|---|---|
| **Subtotal** | $66,944.57 |
| **Tax Total** | $0.00 |
| **Total** | $66,944.57 |

## Remittance Slip

Payment Address:
Oracle America, Inc.
Bank of America Lockbox Services
15612 Collections Center Drive
Chicago, IL 60693

Payment by Wire:
Bank of America
Account #: 1499827093
Account Name: Oracle America, Inc.
Bank Routing No: 026009593
Swift Code: BOFAUS3N

| | |
|---|---|
| Customer | 1245118 Advance Lifts, Inc. |
| Invoice # | 819355 |
| Amount Due | $66,944.57 |
| Amount Paid | |

Payments Online

To pay via credit card, please go to this link to login to your Payment/Customer Center role:

https://system.netsuite.com/app/login/secure/privatelogin.nl?c=NLCORP

Alternately, you can call 877.638.7848 OPTION 4 for assistance.

DocuSign Envelope ID: C3F6D6E9-CF25-4A39-B1EB-C872E670598F

**ORACLE' NETSUITE**

Page 1 of 4

**Estimate**

| Date | 10/22/2019 |
| Estimate # | 659880 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

**Customer Name & Address**
Advance Lifts, Inc.
701 Kirk Rd
Saint Charles IL 60174-3428
United States

**Provisioning Email**
seanm@advancelifts.com

| Item | Qty | Description | Term Mos. | Amount |
|------|-----|-------------|-----------|--------|
| NetSuite SuiteSuccess Manufacturing Prm Cloud Service | 1 | NetSuite SuiteSuccess Manufacturing Prm Cloud Service includes:<br>** ERP with G/L, Accounts Payable, Purchasing, Inventory, Order Entry, A/R, Expense Reporting, Advanced Shipping with integrated shipping depending on your location, use of Fulfillment Requests and Automatic Location Assignment for up to 5000 orders annually.<br>** NetSuite CRM Sales Force Automation with quote and order management, Marketing Automation with campaigns; Customer Service/Support<br>** Productivity tools including contacts/calendar/events<br>**NetSuite Subsidiary Management within customer's home country for a single currency. Additional countries require separate purchase of OneWorld<br>** NetSuite Work Orders and Assemblies Cloud Service<br>** NetSuite Inventory Management Cloud Service<br>** NetSuite Financial Management Cloud Service<br>** NetSuite Procurement Cloud Service<br>** NetSuite Demand Planning Cloud Service<br>** NetSuite Manufacturing WIP and Routings Cloud Service<br>** NetSuite Fixed Asset Management Cloud Service<br>** Real-time Dashboards with key business metrics, report snapshots<br>** Customer, Vendor and Partner Center logins<br>** 5 Employee Self-Service Users<br>** NetSuite Basic Customer Support. Current URL Terms for support are located at www.netsuite.com/supportterms.<br>** 30,000 integrated bulk mail merges per month<br>** 120,000 campaign emails per year with no single blast exceeding 10,000 recipients<br>** 10 GB File Cabinet and 10 GB Data storage per account | 60 | $359,940.00 |
| NetSuite General Access Cloud Service User | 40 | General access user for NetSuite. | 60 | $237,600.00 |
| Customer Learning Cloud Support Pass-Premium-1 user | 1 | Customer Learning Cloud Support Pass for 1 user. The Customer Learning Cloud Support Pass contains online access to the courses included as detailed in the http://www.netsuite.com/termsofservice description (for the number of specified users for the contract term (each person is a "confirmed user"). These training services shall be provided pursuant to the Customer Learning Cloud Support Pass terms and conditions found at http://www.netsuite.com/termsofservice. By signing this Estimate/<br><br>Order Form, you agree to be bound by the Customer Learning Cloud Support Pass terms and conditions. | 60 | $39,900.00 |
| Subtotal | | | | $637,440.00 |
| Discount | | Discount | | ($331,405.06) |

DocuSign Envelope ID: C3F6D6E9-CF25-4A39-B1EB-C872E670598F

# ORACLE' NETSUITE

Page 2 of 4

**Estimate**

| | |
|---|---|
| Date | 10/22/2019 |
| Estimate # | 659880 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

| Item | Qty | Description | Term Mos. | Amount |
|------|-----|-------------|-----------|--------|
| Subtotal | | | | $306,034.94 |
| NetSuite Sandbox Environment Cloud Service | 1 | Sandbox Environment for NetSuite Customers<br>** Replicates production environment including data and customizations<br>** Isolated environment – changes shielded from live production account<br>** One production environment replication for each month of term is included<br>** Administrators may provide sandbox access to all production users as needed<br>Development Environment<br>** Access to Development Environments includes 3 distinct accounts with no data<br>** Isolated environment – changes shielded from live production account.<br>** 10 full access users per Development account<br>** 10 GB File Cabinet and 10 GB Data storage per account<br>** Same features and Cloud Service as the production account<br>** Accounts cannot be used for production purpose<br><br>NetSuite uptime guarantee does not apply to Sandbox and Development Environments. | 60 | $59,754.00 |
| Subtotal | | | | $59,754.00 |
| Discount | | Discount | | ($31,066.10) |
| Subtotal | | | | $28,687.90 |

| | |
|---|---|
| Subtotal | $334,722.84 |
| Total | $334,722.84 |

DocuSign Envelope ID: C3F6D6E9-CF25-4A39-B1EB-C872E670598F

ORACLE' NETSUITE

| | |
|---|---|
| Page 3 of 4 | **Estimate** |
| Date | 10/22/2019 |
| Estimate # | 659880 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

## A. Terms of Your Order

### 1. Agreement

Except as set forth above, the terms and conditions of the applicable agreement between you and Oracle (including any updated URL Terms or other applicable web based terms in effect as of the date of this document) shall apply to the products and/or services set forth on this document. This document is non-cancellable and all fees are non-refundable, unless otherwise explicitly stated in this document or in the Agreement. For clarity, the Service Start Date shall be the date this document is signed by you, unless a different date is specified as the Service Start Date.

The Oracle Data Processing Agreement covering the NetSuite services, which may be found at https://www.oracle.com/corporate/contracts/cloud-services/ ("Data Processing Agreement"). is incorporated herein by this reference and describes how Oracle will process Personal Data (as defined therein) that Customer provides to Oracle as part of Oracle's provision of the NetSuite services to Customer under this Estimate/Order Form ("order"), unless otherwise stated in the Data Processing Agreement or this order. Customer's signature on this order constitutes Customer's agreement to the Data Processing Agreement, unless stated otherwise in the Subscription Services Agreement or License Agreement that governs this order. This Data Processing Agreement only applies to NetSuite services included in this order and does not apply to the following services that may be included in this order: Mobile Push Notifications (a feature of the NetSuite for iPhone Mobile Application), any NetSuite POS Cloud Services, OrderMotion, TribeHR, Light CMS, or any other services identified by Oracle as being excluded from the applicability of this Data Processing Agreement. The Data Processing Agreement also does not apply to any (1) demonstration accounts, trials, beta releases, release preview or other similar versions of the services or (2) any features, services or products which are provided pursuant to a separate agreement or by a party other than Oracle (as defined in the Data Processing Agreement) (e.g. where Oracle is merely a billing/collection agent) including but not limited to Celigo and Pacejet,). For purposes of this order, the definition of "Services Agreement" in Section 11 is deleted and replaced in its entirety with the following definition: "Services Agreement" means (i) the applicable order for the Services you have purchased from Oracle; (ii) the applicable master agreement referenced in the applicable order; (iii) the Privacy Policy found at https://www.oracle.com/legal/privacy/ (or other location as may be updated by Oracle), and (iv) the Data Security Addendum found at www.netsuite.com/tos.

### 2. Start Date

10/31/2019

### 3. Subscription Services Payment Terms

Net 30

### 4. Subscription Services Payment Frequency

Annual in Advance

### 5. Professional Services Payment Terms

N/A

### 6. Currency

USD

### 7. Offer Valid Through

10/31/2019

### 8. Customer Reference

Oracle may refer to You as an Oracle customer of the ordered Services in sales presentations, marketing materials and activities.

DocuSign Envelope ID: C3F6D6E9-CF25-4A39-B1EB-C872E670598F

ORACLE' NETSUITE

Page 4 of 4

Estimate

Date                10/22/2019
Estimate #            659880

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

## B. Additional Order Terms

### 1. Price Hold

During the Services Period, You may order additional quantities of the Cloud Services acquired under this order at the Unit Net Price specified above.

### 2. Renewal Cap

For up to three (3) twelve (12) month Renewal Term immediately following the initial subscription term and subject to Customer's compliance with the terms set forth in this Agreement, Customer's renewal pricing for the Service and number of Users that are set forth on the initial Estimate/Order Form shall not be increased by more than 3% per annum (the "Renewal Cap"), applied to the discounted fees set forth on such Estimate/Order Form for the applicable Service and Users. The aforementioned Renewal Cap pricing shall not be applicable if: (a) the Service and number of Users on a renewal Estimate/Order Form are not equal to or greater than those shown on the applicable Estimate/Order Form(s) for the immediately preceding subscription term; or (b) Customer (or an Affiliate that has a direct or indirect controlling interest in Customer) is acquired or (c) Customer acquires an entity (including, but not limited to acquisition due to merger, share purchase, disposition of all or substantially all of Customer's assets or any transactions having similar effect). In addition, if the number of Customer's and its Affiliates' employees or Users increases during the initial subscription term or any Renewal Term and such increase would require access to a different edition of the Service (as set forth on Oracle's then current price list), then Customer's current discount for the existing edition of the Service (taking into account any applicable Renewal Cap increases) will be applied to the standard list price for such new edition and associated Users.

I AGREE TO THE FEES AND TERMS OF THIS ESTIMATE:

Hank Renken

Print Name

DocuSigned by:
Hank Renken
7833793288859438...
Signature

28 October 2019 | 12:23 PDT

Date

Upon your execution, this document is a binding order for the products and services set forth herein.

Oracle relies on the accuracy of the billing information listed above, and is unable to issue a Credit Memo or resubmit an invoice due to incorrect billing information listed. Please ensure your company name, addresses and contacts included on this document are correct.

Oracle does not accept credit card payments for invoices of more than $99,999.

# EXHIBIT 4

Roman Burkary                                                                    1/25/2021
VP Manufacturing  Netsuite

Subject: Breach of contract & notice of deficiencies

Dear Roman,

Within the Subscription Services Agreement please refer to paragraphs 7.3 Termination for Cause and
9.1 Warranties, Disclaimers and Exclusive Remedies. Our letter of Jan 4, 2021 addressed to your Mr.
Levy should have served notice, however we will formally list the deficiencies below.

Explanation of our requirements:

In the September of 2019 we had an initial meeting to investigate the suitability of your Netsuite
product with our needs. You were represented by Kevin Oppe and Charles Thevenet of Folio 3 who is
your suggested third party development consultant. My team consisted of Henry Renken, President of
Advance Lifts, Inc. our VP of Sales, Michael Renken, our VP of Production, Sean Mays and our Controller,
Al Boris.

In this meeting I explained the nature of our business which was designing and building machinery for
material handling. There are more than 900 standard models, all of which can be customized and
accessorized to meet customer needs. The modifications can be so extensive as to render the base unit
almost unrecognizable. Also, about 10% to 15% of our business each year is totally original custom
design. There are photos on the wall of the conference room that we were in that I used to illustrate
these types of units.

My Controller went into great detail explaining the 6 cost buckets that we use to manage our business.

Our VP of Sales reiterated the fact that "cost type 5" the future cost of a product was essential to our
quotation process and used multiple times per day  by several individuals within the company. He also
gave an explanation of our CRM functions and the complicated pricing and quotation system that would
have to be duplicated. Many subsequent meetings were held on all of these subjects prior to signing any
contracts.

On our telephone conference of 1/19/21 with you, Charles Thevenet did recall the discussion of the
need for multiple cost buckets in the initial meeting.

Prior to signing any contracts, I sat across the conference room table from Kevin Oppe and I asked him if
he was confident that this netsuite system would be an "upgrade" from our current system. Would it do
everything faster and better than our 20 year old Fourth Shift MRP system with the Access based CRM
and quotation system? He assured me that it would. I know that he conferred with Charles Thevenet
and he should have known what our requirements were after the many exploratory meetings that were
held before the contract signing. We were shocked to learn that you did not have an MRP system until
many months after the contract signing even though you knew it was core to our manufacturing
operations.

1

Deficiencies:

1.   Multiple cost buckets and a daily updated "future cost bucket"

Our letter of 11/30/20 spelled out many of the problems we encountered with your system. We consider most of these errors and omissions in the design of the MRP portion of your system. When we met with your ACS group telephonically in December we were told that multiple cost buckets were impossible in your system and there was some argument that a "future cost bucket" was unnecessary and unheard of. Please be advised that our management team has experience with 5 MRP systems that all have multiple cost buckets. JD Edwards a sister Oracle Company to Netsuite sites their ability to produce "future costs" on their website. You should point this out to your team. This must be corrected since it is common practice in the industry and it was clearly pointed out by us as being critical before any contracts were signed.

2.   Improved cost roll and revaluation speed and scriptable start times.

As mentioned in previous letters, with Fourth Shift we program the cost roll to begin each night at 22:00 and both the cost roll and revaluation for 6 cost buckets is completed in less than 1 hour. With Netsuite, the cost roll must be manually started and takes 6 to 8 hours on one night and then the revaluation must be manually started on a second night and takes 10 to 12 hours to complete. In total, your system takes 16 to 20 hours to cost roll and revalue one cost bucket while the old system takes 1 hr. to do the same job for 6 cost buckets. We have people work late on many nights and they all do not know how to start the cost roll so the inability to script starting times is a major problem. None of the other 5 systems our management team has experience with is anywhere near as slow as yours.

3.   Mass replacement in bills.

In last week's telephone conference with you we pointed out that your system lacks a "mass replacement" feature for bills of material. The example was exchanging a transformer in 200 bills of material which took 30 minutes in Fourth Shift and 150 minutes in Netsuite. Our 20 year old system and 3 other systems that Sean Mays had experience with all had "mass replacement" as a standard feature. This is an industry standard.

4.   Automatic identity of all operators who modify bills of material.

Whenever anyone modifies a bill of material in Fourth Shift the system automatically captures that user's identity. Your system requires individuals to choose to self- identify by using a reference field or that information is lost. We consider this a serious omission in your system. It impedes our ability to retrain individuals who create errors and your manual self-identity takes extra time and effort. Automatic identification is common practice.

5.   Slow query and response.

Nearly every operation with your program takes an average of 3 times longer than with our 20 year software running on a 2012 HP computer in our storage room. Last fall I was in a telephonic conference

2

with your Mr. Andrew Gontarz and I asked him if part of the problem with spinning wheels and response delays was attributable to the fact that Fourth Shift was an in house system while Netsuite was on the Cloud. He emphatically answered that was not the case. He pointed out that in a prior position with Epicor, he built the in house systems and loaded the software on these systems and he knew that their operating speeds were slower than the modern cloud based system speeds. Last week, you Roman, stated the opposite so there is disagreement within your group but it really does not matter since the fact remains that your system is slower and clearly not an "upgrade". Sean Mays had extensive experience with JD Edwards and Sean did not experience the slowness with JD Edwards as he is experiencing with Netsuite. We have a 2 gig speed fiber optic connection so that is not the problem. Architecture of your software seems to be the root cause of many of these problems. The slow response times will require us to hire additional personnel to complete the same workload as our old system provides.

Remedies:

Per the paragraphs sited above, you may have 30 days to fix all these problems to our satisfaction. We are not allowed any contingent liabilities. Paragraph 7.3 "Termination for Cause" provides our sole remedy, if we are not satisfied with your "fixes", as termination of contracts with Netsuite. We sincerely believe we are wasting our time trying to put a square peg in a round hole. However, we do understand that you can expend you resources for 30 days to try to satisfy us if you so choose.  Please let us know if this matter can be resolved now or do we have to wait 30 days.

Sincerely yours,

Henry Renken
President
Advance Lifts, Inc.

# EXHIBIT 5

GOLAN | CHRISTIE | TAGLIA

GOLAN CHRISTIE TAGLIA LLP
70 WEST MADISON STREET
SUITE 1500
CHICAGO, ILLINOIS 60602-4206
PHONE (312) 263-2300
FAX (312) 263-0939
GCT.LAW

Writer's Direct Dial (312) 696-1221

Beverly A. Berneman
baberneman@gct.law

**Delivered by Overnight Mail**
**First Class Mail**
**Email to juan.walker@oracle.com**

March 1, 2021

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, CA 94065
Attention: General Counsel
Attention: Juan D. Walker

**Re:    Advance Lifts Inc. v. Oracle America, Inc.**
**Second Notice of Breach**

Dear General Counsel and Mr. Walker:

This office represents Advance Lifts Inc. with respect to a Subscription Services Agreement ("SSA") dated October 28, 2019. Please direct all future correspondence to the undersigned.

On January 25, 2021, Advance Lifts served Roman Bukary, the Vice President of Manufacturing Netsuite, with the enclosed letter citing numerous breaches of the SSA. This letter served as the written specification of the breaches required by Section 7.3 of the SSA. Subsequent to the service of this notice, Mr. Bukary requested and Advance Lifts permitted Oracle to attempt to cure the numerous breaches identified in the January 25, 2021 letter. Advance Lifts permitted Mr. Bukary and Oracle to attempt to cure the breaches within 30 days beginning on January 25, 2021. During that 30 day period, Oracle had 41 contacts with Advance Lifts. During that same period, Folio 3 (Netsuite's implementation partner) had 7 contacts with Advance Lifts. The 30 day period cure period ended on February 26, 2021. At no time did Oracle or Mr. Bukary object to the timing or service of the January 25, 2021 notice or request a different cure period.

On February 23, 2021, Juan D. Walker, Senior Corporate Counsel of Oracle, served Advance Lifts with a letter stating that the January 25, 2021 notice of breach was not an effective notice of breach pursuant to Section 6.2 of the Subscription Services Agreement. Section 6.2 of the SSA only covers notices of a "legal dispute". At no time has Mr. Bukary or Oracle dispute that breaches of the SSA had occurred. In fact, Mr. Bukary treated the January 25, 2021 letter as a proper notice and embarked on attempts to cure the numerous breaches without a reservation of rights. Therefore, we believe that the 30 day notice was served properly and it is disingenuous for Oracle to reject the January 25, 2021 notice of breach.



GOLAN | CHRISTIE | TAGLIA

Oracle General Counsel

March 1, 2021
Page 2

However, so that there is no misunderstanding and without waiving our position that the 30 day notice of breach has already been served and accepted by Oracle, consider this letter an adddditional notice of a legal dispute pursuant to Section 6.2 with respect to the SSA and additional notice of breach as required by Section 7.3 of the SSA. The enumeration of the breaches contained in the January 25, 2021 are adopted and incorporated in this additional notice. Advance Lifts provides this additional notice in order to preserve the rights to which it is entitled as a result of breaches that remain uncured.

Therefore, if the breaches identified in the January 25, 2021 letter are not cured by April 1, 2021, Advance Lifts will terminate SSA pursuant to Section 7.3. Advance Lifts gives further notice pursuant to Section 6.2 that it will seek such other and further remedies including damages for breach of warranty and damages for breach of the terms of the SSA.

Very truly yours,
**GOLAN CHRISTIE TAGLIA LLP**

*Beverly A. Berneman*

Beverly A. Berneman

BAB/al

Enclosure

Roman Burkary                                                          1/25/2021
VP Manufacturing  Netsuite

Subject: Breach of contract & notice of deficiencies

Dear Roman,

Within the Subscription Services Agreement please refer to paragraphs 7.3 Termination for Cause and 9.1 Warranties, Disclaimers and Exclusive Remedies. Our letter of Jan 4, 2021 addressed to your Mr. Levy should have served notice, however we will formally list the deficiencies below.

Explanation of our requirements:

In the September of 2019 we had an initial meeting to investigate the suitability of your Netsuite product with our needs. You were represented by Kevin Oppe and Charles Thevenet of Folio 3 who is your suggested third party development consultant. My team consisted of Henry Renken, President of Advance Lifts, Inc. our VP of Sales, Michael Renken, our VP of Production, Sean Mays and our Controller, Al Boris.

In this meeting I explained the nature of our business which was designing and building machinery for material handling. There are more than 900 standard models, all of which can be customized and accessorized to meet customer needs. The modifications can be so extensive as to render the base unit almost unrecognizable. Also, about 10% to 15% of our business each year is totally original custom design. There are photos on the wall of the conference room that we were in that I used to illustrate these types of units.

My Controller went into great detail explaining the 6 cost buckets that we use to manage our business.

Our VP of Sales reiterated the fact that "cost type 5" the future cost of a product was essential to our quotation process and used multiple times per day  by several individuals within the company. He also gave an explanation of our CRM functions and the complicated pricing and quotation system that would have to be duplicated. Many subsequent meetings were held on all of these subjects prior to signing any contracts.

On our telephone conference of 1/19/21 with you, Charles Thevenet did recall the discussion of the need for multiple cost buckets in the initial meeting.

Prior to signing any contracts, I sat across the conference room table from Kevin Oppe and I asked him if he was confident that this netsuite system would be an "upgrade" from our current system. Would it do everything faster and better than our 20 year old Fourth Shift MRP system with the Access based CRM and quotation system? He assured me that it would. I know that he conferred with Charles Thevenet and he should have known what our requirements were after the many exploratory meetings that were held before the contract signing. We were shocked to learn that you did not have an MRP system until many months after the contract signing even though you knew it was core to our manufacturing operations.

1

Deficiencies:

1.   Multiple cost buckets and a daily updated "future cost bucket"

Our letter of 11/30/20 spelled out many of the problems we encountered with your system. We consider most of these errors and omissions in the design of the MRP portion of your system. When we met with your ACS group telephonically in December we were told that multiple cost buckets were impossible in your system and there was some argument that a "future cost bucket" was unnecessary and unheard of. Please be advised that our management team has experience with 5 MRP systems that all have multiple cost buckets. JD Edwards a sister Oracle Company to Netsuite sites their ability to produce "future costs" on their website. You should point this out to your team. This must be corrected since it is common practice in the industry and it was clearly pointed out by us as being critical before any contracts were signed.

2.   Improved cost roll and revaluation speed and scriptable start times.

As mentioned in previous letters, with Fourth Shift we program the cost roll to begin each night at 22:00 and both the cost roll and revaluation for 6 cost buckets is completed in less than 1 hour. With Netsuite, the cost roll must be manually started and takes 6 to 8 hours on one night and then the revaluation must be manually started on a second night and takes 10 to 12 hours to complete. In total, your system takes 16 to 20 hours to cost roll and revalue one cost bucket while the old system takes 1 hr. to do the same job for 6 cost buckets. We have people work late on many nights and they all do not know how to start the cost roll so the inability to script starting times is a major problem. None of the other 5 systems our management team has experience with is anywhere near as slow as yours.

3.   Mass replacement in bills.

In last week's telephone conference with you we pointed out that your system lacks a "mass replacement" feature for bills of material. The example was exchanging a transformer in 200 bills of material which took 30 minutes in Fourth Shift and 150 minutes in Netsuite. Our 20 year old system and 3 other systems that Sean Mays had experience with all had "mass replacement" as a standard feature. This is an industry standard.

4.   Automatic identity of all operators who modify bills of material.

Whenever anyone modifies a bill of material in Fourth Shift the system automatically captures that user's identity. Your system requires individuals to choose to self- identify by using a reference field or that information is lost. We consider this a serious omission in your system. It impedes our ability to retrain individuals who create errors and your manual self-identity takes extra time and effort. Automatic identification is common practice.

5.  Slow query and response.

Nearly every operation with your program takes an average of 3 times longer than with our 20 year software running on a 2012 HP computer in our storage room. Last fall I was in a telephonic conference

2

with your Mr. Andrew Gontarz and I asked him if part of the problem with spinning wheels and response delays was attributable to the fact that Fourth Shift was an in house system while Netsuite was on the Cloud. He emphatically answered that was not the case. He pointed out that in a prior position with Epicor, he built the in house systems and loaded the software on these systems and he knew that their operating speeds were slower than the modern cloud based system speeds. Last week, you Roman, stated the opposite so there is disagreement within your group but it really does not matter since the fact remains that your system is slower and clearly not an "upgrade". Sean Mays had extensive experience with JD Edwards and Sean did not experience the slowness with JD Edwards as he is experiencing with Netsuite. We have a 2 gig speed fiber optic connection so that is not the problem. Architecture of your software seems to be the root cause of many of these problems. The slow response times will require us to hire additional personnel to complete the same workload as our old system provides.

Remedies:

Per the paragraphs sited above, you may have 30 days to fix all these problems to our satisfaction. We are not allowed any contingent liabilities. Paragraph 7.3 "Termination for Cause" provides our sole remedy, if we are not satisfied with your "fixes", as termination of contracts with Netsuite. We sincerely believe we are wasting our time trying to put a square peg in a round hole. However, we do understand that you can expend you resources for 30 days to try to satisfy us if you so choose.  Please let us know if this matter can be resolved now or do we have to wait 30 days.

Sincerely yours,

Henry Renken
President
Advance Lifts, Inc.

3

# EXHIBIT 6



**GOLAN | CHRISTIE | TAGLIA**

Writer's Direct Dial (312) 696-1221

GOLAN CHRISTIE TAGLIA LLP
70 WEST MADISON STREET
SUITE 1500
CHICAGO, ILLINOIS 60602-4206
PHONE (312) 263-2300
FAX (312) 263-0939
GCT.LAW

Beverly A. Berneman
berneman@gct.law

**Delivered by Overnight Mail**
**First Class Mail**
**Email to juan.walker@oracle.com**

April 8, 2021

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, CA 94065
Attention: Juan D. Walker

Re:    **Advance Lifts Inc. v. Oracle America, Inc.**
       **Notice of Failure to Cure Breach and Termination**

Dear Mr. Walker:

This letter is being served upon you to supplement my letter of March 1, 2021. That letter served as notice from Advance Lifts of its intent pursuant to Section 6.2 to seek remedies including damages for breach of warranty and damages for breach of the terms of the Subscription Services Agreement ("SSA") dated October 28, 2019. I also provided an itemization of the numerous ways in which Oracle breached the SSA. That letter began the thirty day period for cure of the breaches identified in my letter.

Please be advised that Oracle failed to cure the identified breaches within the thirty day cure period. Attached hereto is an itemized list of the continuing breaches of the SSA.

As a result of Oracle's failure to cure breaches of the SSA, Advance Lifts hereby terminates the SSA pursuant to Section 7.3 of the SSA. Although the breaches have been ongoing since the inception of the SSA, Advance Lifts has identified January 1, 2021 as the date of termination.

Very truly yours,
**GOLAN CHRISTIE TAGLIA LLP**

Beverly A. Berneman

BAB/al
Enclosure

Statement of Uncured Breaches

1. Cost buckets: The fixes are unacceptable. Costs 1, 4, & 8 do not roll up at all with the current fix. The very critical cost type 5 (future cost) now rolls continuously in a 1.5 hour loop but the material costs do not sum or aggregate correctly to the highest level of a multi-level bill of materials and are therefore useless. Our current Fourth Shift software is scheduled to roll costs every night at 10:00pm and all four (4) costs aggregate or sum to correct costs at the top level of each multi-level bill of materials.

2. Cost roll and revaluation time: Not acceptable. The Fourth Shift software that we have used for over 20 years, is scheduled to do the cost roll and revaluation of cost type 1 (standard costs) each night at 10:00pm. The process takes about 1 hour total for both the cost roll and revaluation. The Netsuite software takes 4.35 hours for the cost roll and 4.5 hours for the revaluation which totals to 8.85 hours. With Netsuite each process must be manually started separately in sequence and there is no way to schedule these processes to begin automatically at night. We cannot start the day with up to date information.

3. Mass item replacement in bills of material: Not acceptable. There was no attempt to provide this feature. Not only has this been available for more than 20 years in our Fourth Shift software, we know of at least 5 other systems that have this as a standard feature. The example of one case was sited in my letter of 1/25/21 where we had to change transformers in 200 bills of material because of supplier problems. This took 30 minutes in Fourth Shift and 150 minutes in Netsuite. Mass replacements like this are common place.

4. User ID in BOM history: Not acceptable. This is an automatic feature on Fourth Shift and other systems. Netsuite does not automatically populate this field therefore auditing how or who entered errors is often impossible.

5. General slowness: Unacceptable. We are often faced with spinning wheel lag times when using Netsuite and have timed a few of our more common tasks as follows:
   a. Standard cost inquiry: Fourth Shift averages 3.2 seconds – Netsuite averages 13.4 seconds which is a 318% increase in time.
   b. Entering a part number and routing: Fourth Shift averages 6 seconds – Netsuite averages 26.5 seconds which is a 341% increase in time.
   c. Create a work order and receive 10 components: Fourth Shift averages 164 seconds – Netsuite averages 492 seconds which is a 200% increase in time.
   d. Update on the costed bill of material inquiry screen: The Netsuite support team agreed that these times were too slow and had us enter a Support Case 3973637. After weeks of work we received the following reply from Pablo at Oracle. "I called to notify you that after further investigation and tests, the QA team mentioned that this is a fact of life since the query is too complex and for the particular structure of assembly BOMs it does not perform well. The only way to fix this on their end is to redo the whole costed BOM inquiry report. This defect will be transformed into an enhancement and may be reviewed and released by product management." There was no guess as to when something like that might happen.

{00138691.DOC /}

# EXHIBIT 7

 GOLAN | CHRISTIE | TAGLIA

Writer's Direct Dial (312) 696-1221

**GOLAN CHRISTIE TAGLIA LLP**
70 WEST MADISON STREET
SUITE 1500
CHICAGO, ILLINOIS 60602-4206
PHONE (312) 263-2300
FAX (312) 263-0939
GCT.LAW

Beverly A. Berneman
baberneman@gct.law

April 8, 2021

**Delivered by Overnight Mail**
**First Class Mail**
**Email**

Kimberly Galerneau
Vice President, Credit Officer
Banc of America Leasing & Capital, LLC
135 South LaSalle Street
Chicago, Illinois 60603
Email: Kimberly.A.Galerneau@leaseadmincenter.com

**Re:    Advance Lifts Inc.**
**Account Number 12573-54255**

Dear Ms. Galerneau:

This letter is to advise you that that Advance Lifts Inc. terminated the Subscription Services Agreement ("SSA") dated October 28, 2019, between it and Oracle America. As per the attached letter, the termination occurred as a result of Oracle America's failure to cure numerous breaches.

Pursuant to the above identified Notification of Assignment dated December 16, 2019, Oracle America assigned only the right to receive payment from Advance Lifts. The "Customer Rights" section of the assignment and Section 4 of the terms state that any rights and remedies that Advance Lifts has against Oracle America are not affected. Under the SSA, Advance Lifts has the right to terminate the SSA upon Oracle America's failure to cure the numerous breached identified in the attached letter.

Therefore, pursuant to Section A of the assignment, Advance Lifts hereby notifies you that fees are no longer due from Advance Lifts effective January 1, 2021.

Very truly yours,

**GOLAN CHRISTIE TAGLIA LLP**

Beverly A. Berneman

BAB/al
Attachment

{00468181.DOCX /}



**GOLAN | CHRISTIE | TAGLIA**

Writer's Direct Dial (312) 696-1221

GOLAN CHRISTIE TAGLIA LLP
70 WEST MADISON STREET
SUITE 1500
CHICAGO, ILLINOIS 60602-4206
PHONE (312) 263-2300
FAX (312) 263-0939
GCT.LAW

Beverly A. Berneman
baberneman@gct.law

**Delivered by Overnight Mail**
**First Class Mail**
**Email to juan.walker@oracle.com**

April 8, 2021

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, CA 94065
Attention: Juan D. Walker

> **Re:    Advance Lifts Inc. v. Oracle America, Inc.**
> **Notice of Failure to Cure Breach and Termination**

Dear Mr. Walker:

This letter is being served upon you to supplement my letter of March 1, 2021. That letter served as notice from Advance Lifts of its intent pursuant to Section 6.2 to seek remedies including damages for breach of warranty and damages for breach of the terms of the Subscription Services Agreement ("SSA") dated October 28, 2019. I also provided an itemization of the numerous ways in which Oracle breached the SSA. That letter began the thirty day period for cure of the breaches identified in my letter.

Please be advised that Oracle failed to cure the identified breaches within the thirty day cure period. Attached hereto is an itemized list of the continuing breaches of the SSA.

As a result of Oracle's failure to cure breaches of the SSA, Advance Lifts hereby terminates the SSA pursuant to Section 7.3 of the SSA. Although the breaches have been ongoing since the inception of the SSA, Advance Lifts has identified January 1, 2021 as the date of termination.

Very truly yours,
**GOLAN CHRISTIE TAGLIA LLP**

Beverly A. Berneman

BAB/al
Enclosure

Statement of Uncured Breaches

1. Cost buckets: The fixes are unacceptable. Costs 1, 4, & 8 do not roll up at all with the current fix. The very critical cost type 5 (future cost) now rolls continuously in a 1.5 hour loop but the material costs do not sum or aggregate correctly to the highest level of a multi-level bill of materials and are therefore useless. Our current Fourth Shift software is scheduled to roll costs every night at 10:00pm and all four (4) costs aggregate or sum to correct costs at the top level of each multi-level bill of materials.

2. Cost roll and revaluation time: Not acceptable. The Fourth Shift software that we have used for over 20 years, is scheduled to do the cost roll and revaluation of cost type 1 (standard costs) each night at 10:00pm. The process takes about 1 hour total for both the cost roll and revaluation. The Netsuite software takes 4.35 hours for the cost roll and 4.5 hours for the revaluation which totals to 8.85 hours. With Netsuite each process must be manually started separately in sequence and there is no way to schedule these processes to begin automatically at night. We cannot start the day with up to date information.

3. Mass item replacement in bills of material: Not acceptable. There was no attempt to provide this feature. Not only has this been available for more than 20 years in our Fourth Shift software, we know of at least 5 other systems that have this as a standard feature. The example of one case was sited in my letter of 1/25/21 where we had to change transformers in 200 bills of material because of supplier problems. This took 30 minutes in Fourth Shift and 150 minutes in Netsuite. Mass replacements like this are common place.

4. User ID in BOM history: Not acceptable. This is an automatic feature on Fourth Shift and other systems. Netsuite does not automatically populate this field therefore auditing how or who entered errors is often impossible.

5. General slowness: Unacceptable. We are often faced with spinning wheel lag times when using Netsuite and have timed a few of our more common tasks as follows:
   a. Standard cost inquiry: Fourth Shift averages 3.2 seconds – Netsuite averages 13.4 seconds which is a 318% increase in time.
   b. Entering a part number and routing: Fourth Shift averages 6 seconds – Netsuite averages 26.5 seconds which is a 341% increase in time.
   c. Create a work order and receive 10 components: Fourth Shift averages 164 seconds – Netsuite averages 492 seconds which is a 200% increase in time.
   d. Update on the costed bill of material inquiry screen: The Netsuite support team agreed that these times were too slow and had us enter a Support Case 3973637. After weeks of work we received the following reply from Pablo at Oracle. "I called to notify you that after further investigation and tests, the QA team mentioned that this is a fact of life since the query is too complex and for the particular structure of assembly BOMs it does not perform well. The only way to fix this on their end is to redo the whole costed BOM inquiry report. This defect will be transformed into an enhancement and may be reviewed and released by product management." There was no guess as to when something like that might happen.

{00138691.DOC /}